BACHE HALSEY STUART, INC., a
Michigan Corporation, Plaintiff,

v.

Bradley KILLOP, Defendant.

Civ. A. No. 76–71928.

United States District Court,
E. D. Michigan, S. D.

Nov. 15, 1979 and June 23, 1980.

Edward B. Harrison and John H. Otto,
Fischer, Franklin, Ford, Simon & Hogg,
Detroit, Mich., for plaintiff.

Bradley Killop, pro se.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This case is before the court on plaintiff's motion for summary judgment. For the reasons set forth below, plaintiff's motion is granted.

Plaintiff Bache Halsey Stuart, Inc., (hereinafter "Bache Halsey" or "BH") is a broker of securities. At all times relevant to this action, defendant Bradley Killop was a customer of Bache Halsey. The BH employee with whom Killop dealt in the transactions which are the subject of this suit was Jack Smith.

In June of 1975, defendant's account with BH in the San Diego, California office was

transferred to a new BH office in Rancho Sante Fe, California. The transfer resulted in a clerical error by which BH understated the debit balance of the account by nearly $30,000.00. This understatement was recorded on a Statement of Account sent to defendant and dated June 30, 1975. In his deposition, Killop testified that he did not examine this statement until sometime in August of 1975. (Dep. pp. 56–57.) In the interim, on July 9, the error was discovered and corrected by BH.

As of July 27, 1975, Killop maintained a margin account with BH wherein he held securities, and a special cash account wherein he held options to purchase certain securities. On July 28, Killop instructed BH to exercise certain options, and, pursuant to these instructions, BH purchased for Killop's account securities at the aggregate purchase price, including taxes and commissions, of $767,860.70.

Plaintiff alleges that during the week following these purchases it made repeated demands on Killop to pay what BH though was the legally required margin requirement of $378,000.00, and that Killop assured BH that the margin requirement would be timely met. Defendant denies these allegations, and contends that he and Smith had reached an agreement (independent of the written contract between BH and Killop) whereby Killop would not have to pay the amounts due for the purchase of the securities until after the securities were liquidated. It was Killop's apparent plan to repay BH out of the proceeds of sale, and Killop apparently assumed or hoped that the liquidation of the securities would result in a profit which he would retain.

It is undisputed that BH liquidated both Killop's special cash account and his margin account on August 6 and 7, 1975. For purposes of this motion, BH concedes that the sales of the securities and options in these accounts were without Killop's authorization. Following the liquidation, BH determined that the sales proceeds, less commissions and taxes, were insufficient to cover the amounts Killop owed BH. The debit balance was determined to be $22,704.00.

Although he initially denied liability in this amount, Killop subsequently acknowledged that BH's `calculations were correct. (Killop's answer to BH's first set of interrogatories, question 10.)

Bache Halsey instituted this contract action for $22,704.00 it claimed Killop owed after Killop failed to pay pursuant to BH's written demands. Killop's answer to the complaint contained nine affirmative defenses, each of which had a corresponding counterclaim for damages. Since answering, Killop has withdrawn four affirmative defenses and six counterclaims. The balance of Killop's defenses and claims are discussed below.

The basis for Bache Halsey's suit is the written agreement between the parties wherein Killop agreed to pay any debit balance, interest, and service charges. As noted above, Killop has admitted the correctness of the calculation of the debit balance which BH claims is due. Killop is therefore liable for the amount claimed unless he has raised a valid affirmative defense or counterclaim.

Where the affirmative defenses raised by Killop present the same legal issue, they will be discussed together. For ease of discussion, reference to the affirmative defenses and counterclaims will be by their numbers in defendant's answer.

The factual basis for affirmative defense III is Killop's allegation that within the 90 days preceding the purchase of the securities on July 28, BH had sold for Killop certain securities out of defendant's special cash account before Killop had paid BH the purchase price of the securities. Furthermore, Killop contends that he and Smith had agreed that payment of the purchase price of the securities purchased on July 28 did not need to be made prior to the liquidation of those securities. For purposes of this motion, the court accepts those allegations as fact.

The factual basis of affirmative defense IV is Killop's allegation that payment of the purchase price of the July 28 transaction was not made within 7 days of July 28. Killop further alleges that BH failed to

obtain an extension of the 7 day period as required by Regulation T (discussed below) or if BH did obtain an extension, it did so by means of material misstatements of fact. These allegations are also accepted as fact.

Defendant correctly contends that these facts establish violations by Bache Halsey of Regulation T of the Federal Reserve Board, adopted pursuant to the Securities Exchange Act, particularly §§ 7 and 8(a), 15 U.S.C. §§ 78g, 78h(a). Section 220.4(c)(8) of Regulation T provides:

> Unless funds sufficient for the purpose are already in the account, no security . . . shall be purchased for . . . any customer in a special cash account with the creditor if any security . . . has been purchased by such customer in such account, and then, for any reason whatever, without having been previously paid for in full by the customer, the security has been sold in the account . . . during the preceding 90 days . . . C.F.R. § 220.-4(c)(8).

Thus, the facts underlying affirmative defense III make out a violation of Regulation T.

Regulation T, section 220.4(c)(2), further provides that where a customer purchases a security in a special cash account and does not make full payment within 7 days of the purchase date, the creditor (broker) must promptly liquidate the transaction or unsettled portion thereof. Subparagraph (6) of that section, however, authorizes the creditor to obtain an extension of the 7 day period by a good faith application to an appropriate committee of a national securities exchange. Thus, the facts underlying affirmative defense IV also make out a violation of Regulation T.

In addition to interposing BH's violations of Regulation T as affirmative defenses, Killop initially counterclaimed for damages on these grounds as well. Killop dropped these counterclaims in view of a recent amendment to the Securities Exchange Act, 15 U.S.C. § 78g(f), which makes the receipt as well as extension of prohibited credit unlawful. Regulation X of the Federal Reserve Board, adopted pursuant to § 78g(f), provides:

> A borrower shall not obtain any purpose credit [credit for the purpose of purchasing or carrying securities] from within the United States unless he does so in compliance with the following conditions:
>
> . . . . .
>
> (2) Credit obtained from a broker/dealer shall conform to the provisions of Part 220 of this chapter (Regulation T), which is hereby incorporated in this part (Regulation X).

Recent cases construing Regulation X have concluded that a client no longer has a private cause of action against his broker for the broker's violations of Regulation T, as both the client and the broker are in violation of the Securities Exchange Act. See e. g. *Utah State University v. Bear, Stearns & Co.*, 549 F.2d 164 (10th Cir. 1977), cert. denied 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977), and the cases cited therein. The Sixth Circuit concluded, in a situation in which the transaction took place before the effective date of Regulation X, the client did have a private cause of action against his broker. *Spoon v. Walston & Co.*, 478 F.2d 246 (6th Cir. 1973). In a later case, however, the court reserved the question as to whether a client has a private cause of action under Regulation T. *Fryling v. Merrill Lynch, Pierce, Fenner & Smith*, 593 F.2d 736 (6th Cir. 1979).

Here, defendant Killop does not even maintain that BH's violations of Regulation T provide him with a private cause of action to recoup the losses he suffered in the stock transactions in question. Rather, he concedes the logic of the conclusion that Regulation X has operated to undercut a client's private cause of action. Yet, defendant Killop argues that BH's violations of Regulation T should provide him with valid affirmative defenses to its suit for money due under the contract. Neither party has been able to cite any authority for its position on this legal issue. Yet, for the reasons given below, this court finds the defendant's argument unpersuasive.

In *Utah State, supra,* the court stated that imposition of civil liability on a broker for violations of Regulation T:

> places the customer in a "heads I win—tails you lose" position. If the stock goes up, he takes his profit. If it goes down, he recovers his loss from the broker. Congress imposed the margin requirements to protect the general economy, not to give the customer a free ride at the expense of the broker. 549 F.2d 164, 170.

The court finds the reasoning of the Tenth Circuit to be sound and applicable to the facts of this case. Recognition of the affirmative defense urged by defendant Killop would have the effect of maintaining the "heads I win—tails you lose" position rejected by *Utah State.* In addition, the "penalty" imposed on a broker for its violations of Regulation T would, in this type of situation, necessarily vary with the amounts received in liquidation of the customer's accounts and the customer's debit or credit balance at the time of the liquidation. Conversely, if the liquidation yields proceeds sufficient to make the broker whole, the client would necessarily have to sue to recover his losses—precisely the legal remedy rejected by *Utah State,* and acknowledged by Killop as being unavailable to him in this suit when he waived his counterclaims based on these violations.

Defendant advances a somewhat more sophisticated theory in support of his argument that BH's violations of Regulation T should afford him an affirmative defense in this suit. Citing 17 Am.Jur.2d § 221, Killop points to Regulations T and X and states that these regulations operated to make the entire credit transaction illegal, and that therefore the credit contract was illegal and unenforceable. Defendant's Brief, p. 12. Defendant's own authority, however, provides ample basis for refuting this argument, even if both parties to this agreement are in pari delicto:

> [S]ince the public interest or policy is the overriding consideration in denying relief to a party to a contract who is in pari delicto, it follows that there may be circumstances under which the public interest would be subserved better by granting than by denying relief to such party, and in such cases the general rule denying relief must yield to the public interest. Accordingly, if it is necessary, in order to discountenance such transactions and promote the public interest, to enforce such an agreement at law ... it will be done although both parties are in pari delicto. The general rule denying relief will not be applied if its application would give effect to the original purpose and encourage persons who engage in such transactions. 17 Am.Jur.2d § 122.

In the case before this court, allowing the affirmative defense urged by Killop would have the effect of encouraging stock transactions through the use of prohibited credit. Recognizing this defense would offer tantalizing temptation to an individual who wishes to speculate in the stock market without risking his own money. Indeed, the greater the client's debit balance, the more appeal such a plan would have. Any profit realized by the stock transactions would be pocketed by the client, while losses would necessarily be absorbed, at least partially, by the broker. Recognition of the view that Congress imposed the margin requirements to protect the general economy from the infusion of prohibited credit mandates the rejection of affirmative defenses III and IV.

Affirmative defenses VI and VII and their corresponding counterclaims for damages are based on BH's liquidation of Killop's margin and special accounts, respectively, and retention of the sale proceeds to offset amounts due BH. The affirmative defenses in Killop's answer state that these unauthorized liquidations constitute conversion, rendering BH liable to Killop for damages. BH, however, relies on paragraph 5 of the Customer's Agreement, wherein BH is expressly authorized to sell securities in Killop's accounts whenever BH deemed it desirable for its protection.

Paragraph 5 of the Customer's Agreement provides:

I [Killop] will maintain such margins as you [BH] may in your discretion require from time to time and will pay on demand any debit balance owing with respect to any of my accounts. Whenever in your discretion you deem it desirable for your protection, (and without the necessity of a margin call) ... you may, without prior demand, tender, and without any notice of the time or place of sale, all of which are expressly waived, sell any or all securities, or commodities or contracts relating thereto which may be in your possession, or which you may be carrying for me, or buy any securities, or commodities or contracts relating thereto of which my account or accounts may be short, in order to close out in whole or in part any commitment in my behalf or you may place stop orders with respects [sic] to such securities or commodities and such sale or purchase may be made at your discretion on any Exchange or other market where such business is then transacted, or at public auction or private sale, with or without advertising and no demands, calls, tenders or notices which you may make or give in any one or more instances shall invalidate the aforesaid waivers on my part . . . .

Paragraph 4 of the Customer's Agreement provides:

Any and all credit balances, securities, commodities or contracts relating thereto, and all other property of whatsoever kind belonging to me [Killop] or in which I may have an interest held by you [BH] or carried for my accounts shall be subject to a general lien for the discharge of my obligations to you ... however arising and without regard to whether or not you have made advances with respect to such property and without notice to me may be carried in your general loans and all securities may be pledged, repledged, hypothecated, or rehypothecated, separately or in common with other securities or any other property, for the sums due to you thereon or for a greater sum and without retaining in your possession and control for delivery a like amount of similar securities or other property. At any time and

from time to time you may, in your discretion, without notice to me, apply and/or transfer any securities, commodities, contracts relating thereto, cash or any other property therein, interchangeably between any of my accounts, whether individual or joint or from any of my accounts to any account guaranteed by me. You are specifically authorized to transfer to my cash account on the settlement day following a purchase made in that account, excess funds available in any of my other accounts, including but not limited to any free balances in any margin account or in any non-regulated commodities account, sufficient to make full payment of this cash purchase. I agree that any debit occurring in any of my accounts may be transferred by you at your option to my margin account.

These paragraphs of the agreement clearly gave BH the right to liquidate Killop's account. Killop argues, however, that § 220.4(a)(2) and (3) of Regulation T operated to prohibit the liquidation of both accounts even though BH deemed it "desirable" for its financial protection. This court is unconvinced, however, that BH's liquidation of Killop's accounts was prohibited by Regulation T.

Subparagraphs (2) and (3) of § 220.4(a), C.F.R. § 220.4(a)(2), (3), provide:

(2) Each such special account shall be recorded separately and shall be confined to the transactions and relations specifically authorized for such account . . .

(3) A special account established pursuant to this section shall not be used in any way for the purpose of circumventing any of the provisions of this part. If a customer has with a creditor both a general account and one or more special accounts, the creditor shall treat each such special account as if the customer had with the creditor no general account . . .

Killop maintains that these provisions apply to the contract between him and BH by virtue of paragraph 15 of the Customer's Agreement whereby any provision of the

agreement which became inconsistent with any law, rule, or regulation would be superseded or modified to conform. Plaintiff does not dispute the applicability of the regulation cited, but denies that it operated to prohibit BH from liquidating Killop's accounts when it deemed itself insecure. "There is nothing inconsistent between keeping accounts separate and liquidating all of a customer's accounts when a broker feels insecure." Plaintiff's Reply Brief, p. 4.

Defendant's argument that C.F.R. § 220.-4(a)(2) and (3) prohibit the liquidation of the accounts made by BH is made without benefit of case law, and this court is aware of no cases which have interpreted those sections as barring the liquidation authorized by the contract. Furthermore, it appears to this court that those sections of Regulation T relied on by defendant were not intended to prohibit a broker's liquidation of a client's accounts upon deeming itself insecure. Rather, it appears that § 220.4(a)(2) and (3) were intended to prohibit the practice whereby the equity in a general account would be used to support a purchase transaction in a special account, which would have the effect of circumventing the credit provisions applicable to special accounts.

Furthermore, § 220.7(e)(2) specifically authorizes the liquidations of Killop's margin and special accounts:

(e) *Additional requirements by exchanges and creditors.* Nothing in this part shall ... (2) modify or restrict the right of any creditor to require additional security for the maintenance of any credit, to refuse to extend credit, or to sell any securities or property held as collateral for any loan or credit extended by him.

As noted above, BH, by virtue of Paragraph 4 of the Customer's Agreement, had a general lien on all securities held by BH and owned by Killop. Section 220.7(e)(2) thus authorizes the liquidations here at issue.

Finally, it is necessary to note that the facts in this case are not clear on a minor point raised by defendant in his brief opposing summary judgment. Killop implies that following the liquidation of his margin account, the proceeds of those securities were used to offset deficiencies in *both* his margin and special accounts. Killop further maintains that this "cost-collateralization" was barred by § 220.4(a)(2) and (3). The record does not disclose whether BH did, in fact, apply any surplus from the margin account against any deficiency in the special account. Taking the facts most favorable to the defendant and assuming that BH did offset any surplus, however, § 220.7(e)(2) and Paragraph 4 of the Customer's Agreement authorized this course of action.

In view of the foregoing, plaintiff's motion for summary judgment is granted as to affirmative defenses and counterclaims VI and VII.

Affirmative defense and counterclaim IX, the last interposed by Killop, are based on the clerical error made by BH when it transferred Killop's account from one office in California to another. As noted above, this error resulted in an understatement of Killop's debit balance by nearly $30,000. Killop asserts that because of this negligent error, he purchased the options and securities which are the subject of this lawsuit.

It is unnecessary to decide whether the error admittedly made by BH was negligent, for Killop's own deposition testimony completely refutes his allegations that he purchased the stock "because of" BH's error. Killop testified that he did not examine the June 30 statement until "sometime in August" when he tried to reconcile his account. He further testified that he was unaware of the error until that time. This testimony indicates that Killop did not rely on the June 30 statement when deciding to purchase the options and stock here at issue, and, in fact, made his decision to purchase without reference to the balance in his account.

Essential to a cause of action in negligence is a showing of causation. Because Killop's testimony indicates that he did not rely on the error, whether negligent or not, made by BH, it is clear that the required

showing of causation cannot be made. Accordingly, plaintiff is granted summary judgment on affirmative defense and counterclaim IX.

In summary, the court finds that Bache Halsey's violations of Regulation T do not afford defendant Killop affirmative defenses to this contract action. Furthermore, BH's liquidation of Killop's accounts was authorized by the contract between the parties, and not prohibited by Regulation T. Finally, Killop's negligence defense and counterclaim lack merit due to Killop's own testimony which refutes allegations of causation. Accordingly, plaintiff's motion for summary judgment is granted.

So ordered.

This case is before the court on defendant's motion for rehearing of this court's order of November 15, 1979 granting plaintiff summary judgment. Following the timely filing of defendant's motion for rehearing, the court invited plaintiff to respond to the arguments raised by defendant. Additionally, the parties were invited to supplement the record with affidavits in order that the court could treat this motion as a renewed motion for summary judgment by plaintiff. Oral argument was heard on the factual and legal issues raised by this motion on May 27, 1980. For the following reasons, summary judgment which was previously entered in this case is vacated. However, the issues remaining to be litigated in this case are limited to those set forth in this opinion.

Defendant's motion for rehearing was limited to the claim that the court's determination that plaintiff's alleged violations of Regulation T do not afford defendant an affirmative defense to this action for money due on the contract was in error. In his motion for rehearing, defendant raised for the first time the argument that plaintiff's alleged violation of Regulation T made the contract sued on void under the provisions of § 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b). It is on the basis of this narrow claim under this statute that summary judgment heretofore entered in this case must be vacated. The

court's determination that a violation of Regulation T on the part of a broker does not afford the client with an affirmative defense is not disturbed by this order. There is no affirmative defense available if a client cannot, under law, invoke the protection of § 29(b). In other words, that section provides the only legally cognizable defense to an action for money due under an account agreement such as the one involved in this case, and there is no "common law" defense available to a client such as defendant based on alleged violations on the part of a broker, apart from the protection afforded by § 29(b).

Section 29(b) provides:

Every contract made in violation of any provision of this chapter or any rule or regulation thereunder, and every contract ... made, the performance of which involves the violation of ... any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract ...

15 U.S.C. § 78cc(b).

Although § 29(b) speaks in terms of voidness, it has been held that contracts subject to that statute are not truly void, but are "more properly 'voidable' since the law in effect gives an innocent party the right to affirm or rescind." *Goldman v. Bank of the Commonwealth*, 332 F.Supp. 699 (E.D.Mich. 1971), aff'd 467 F.2d 439 (6th Cir. 1972). The availability of rescission depends on equitable principles. *Id.* Depending on the extent of wrongdoing of each party, the appropriate remedy necessarily differs from case to case. Compare *Goldman* with *Serzysko v. Chase Manhattan Bank*, 290 F.Supp. 74 (S.D.N.Y.1968), aff'd 409 F.2d 1360 (2d Cir. 1969), cert. den. 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969). *Freeman v. Marine Midland Bank*, 1979 Fed.Sec.Law Rep. (CCH) 96,902 (E.D. N.Y.1979). See also, *Naftalin and Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 469 F.2d 1166 (8th Cir. 1972), where the court noted that any remedy fashioned

under § 29(b) should have a goal of effectuating the purposes of the regulatory legislation under consideration.

Because a violation of Regulation T will not automatically afford a defendant with a complete defense, but instead may be considered in determining whether the contract should be rescinded, this court will treat Affirmative Defense III as stating a claim for rescission, unless defendant indicates to the contrary. In this event, defendant's motion for rehearing will be denied. Affirmative Defense III appears to set forth two independent grounds on which defendant argues that he is not liable for amounts due under the contract. First, defendant states that under the requirements of Regulation T, 12 C.F.R. § 220.4(c)(8), plaintiff was required to obtain cash payment prior to defendant's purchase of the securities of July 1975, because he had, within the 90 days prior to the transactions of July, made purchases of securities and had sold the securities prior to making full payment. Second, the defendant claims that there was no agreement between plaintiff and defendant that payment for the July purchases would be made prior to resale. This allegation is more fully explained in defendant's answer # 22 to plaintiff's second interrogatories, where he states that he had an agreement with Jack Smith that securities would be bought and then sold without the necessity for cash deposit. "This is the type of buy-sale transactions which Mr. Smith encouraged defendant to engage in and which defendant and plaintiff had engaged previously."

The availability of the equitable remedy of rescission based on the first ground set forth above depends in part on whether the transactions in May and June of 1975 were such as to make the provisions of § 220.-4(c)(8) applicable. In support of its renewed motion for summary judgment, plaintiff presented copies of defendant's account statements for the 90 days preceding the July transactions. It is not clear from these account statements whether, and to what extent, purchases were made and sales followed prior to full payment by the defendant. If a technical violation of § 220.4(c)(8) did occur, the circumstances surrounding the violation would necessarily require examination in order to determine whether they were such as to warrant imposition of any responsibility for the violation on plaintiff, and thus provide defendant with any basis for seeking rescission.

More important is the second factual basis for Affirmative Defense III, that of the alleged agreement between Smith and the defendant that he would not have to pay the purchase price for the securities prior to their sale. Such an agreement would have as its purpose the violation of Regulation T. 12 C.F.R. § 220.4(c)(1)(i). In addition, depending on the particular terms of this agreement, it is possible that a violation of § 220.4(c)(8) was contemplated as well.

The record is insufficiently developed at this time to determine whether there was such an agreement, and if there was, what the terms of that agreement were. In addition, it is impossible to determine whether plaintiff had information sufficient to charge it with responsibility for the transactions entered into pursuant to that alleged agreement.

Accordingly, in the absence of further action defined herein on the part of the defendant, summary judgment heretofore entered in this case is vacated. The issues remaining for litigation in this case are limited to whether there was a violation of Regulation T as alleged in Affirmative Defense III, and if there was, whether the conduct of the parties was such as to enable defendant to seek rescission under § 29(b) of the Securities Exchange Act. The court also notes that at the hearing on this motion, defendant withdrew Affirmative Defense IV which was also based on Regulation T.

So ordered.