[No. 6254-6-III. Division Three. April 23, 1985.]

WARREN A. STYNER, JR., ET AL, *Respondents,* v.
G. JAMES ENGLAND, ET AL, *Appellants.*

*Ronald F. Whitaker* and *Walters, Whitaker, Finney & Falk,* for appellants.

*Alan A. McDonald* and *Halverson, Applegate & McDonald,* for respondents.

McINTURFF, A.C.J.—Warren Styner and Kent McLachlan, d/b/a Stymac, a partnership, commenced this action against the marital community of G. James and Suzanne England to recover damages for Mr. England's failure to pay for shares of stock he ordered through a broker. The court granted Stymac summary judgment and awarded $23,968.75. This appeal challenges Stymac's standing to sue and whether a broker's violation of federal margin regulations precludes this claim. We affirm.

On December 1, 1981, Mr. England placed an order with Shearson, Loeb, Rhodes, Inc. (hereinafter Shearson) stockbroker Ward Styner[1] to purchase 59,000 shares of Hingeline Overthrust Oil and Gas, then valued at $75,593.75. Ward Styner placed the order with Shearson, which performed the necessary transactions and subsequently notified Mr. England he should deposit the purchase price by 10 a.m. December 10, 1981. Mr. England knew his failure to purchase the stock would not discharge him from any losses sustained by reason of a decline in the market value of the stock while in Shearson's possession. For the next several days the market value of the Hingeline stock plummeted and by December 10, 1981, fell to $51,695. Mr. England has

---

[1]Ward Styner is the son of Warren Styner, a copartner of Stymac. Warren Styner managed the Shearson Yakima office throughout the time in question.

not paid for the stock.

Mr. England's refusal to pay placed Ward Styner in a precarious financial position because Shearson placed all losses resulting from unpurchased securities upon its agents. Since Ward Styner was apparently unable to sustain the loss arising out of Mr. England's unpurchased order, Stymac purchased the stock at the price to which Mr. England agreed, knowing the true market value of the stock was substantially less. Shearson subsequently assigned Stymac its chose in action against Mr. England.

We first address whether Stymac has standing to sue the Englands for breach of contract. The Englands principally contend Stymac lacks standing because it purchased the stock from Shearson, which did not sustain loss and therefore had no chose in action to assign.

In reviewing an order for summary judgment, this court engages in the same inquiry as the trial court. *Yeats v. Estate of Yeats,* 90 Wn.2d 201, 203, 580 P.2d 617 (1978); *Chadwick v. Northwest Airlines, Inc.,* 33 Wn. App. 297, 304, 654 P.2d 1215 (1982), *aff'd,* 100 Wn.2d 221, 667 P.2d 1104 (1983). An agency relationship exists between a stockbroker and the brokerage house for which he works. *See, e.g., Carras v. Burns,* 516 F.2d 251, 259 (4th Cir. 1975); *Verrecchia v. Paine, Webber, Jackson & Curtis,* 563 F. Supp. 360, 365 (D.P.R. 1982); *cf.* 1 W. Black, *Stock Exchanges, Stockbrokers & Customers* §§ 7, 21–36 (1940). Generally, a principal is entitled to maintain a claim on a contract made by his agent with a third party if: (1) the principal is named as the contracting party, (2) the third party is bound by the contract, and (3) the third party is liable to the principal to the same extent as if he had contracted with the principal in person. *Taub v. Colonial Coated Textile Corp.,* 54 A.D.2d 660, 387 N.Y.S.2d 869, 870 (1976); *Sumner v. Flowers,* 130 Cal. App. 2d 672, 279 P.2d 772, 774 (1955); Restatement (Second) of Agency § 292 (1958); P. Mechem, *Outline of the Law of Agency* §§ 294–296 (4th ed. 1952).

Here, Ward Styner, as agent for Shearson, contracted to

sell 59,000 shares to Mr. England. Shearson provided Mr. England written confirmation of the order and sent a mailgram informing Mr. England that his failure to pay for the stock would require Shearson to liquidate the securities in satisfaction of losses sustained. This evidence establishes the Shearson–Styner agency relationship and also that Shearson was entitled to maintain any claim Ward Styner would have had against Mr. England.

■ The next question, then, is whether Shearson had a chose in action against Mr. England for his default in the payment of the stock ordered. Where a customer defaults in the payment of stock purchased for him or refuses to accept and pay for such stock, "the broker may sell the stock and hold the customer responsible for any deficit." *Herron Northwest, Inc. v. Danskin,* 78 Wn.2d 500, 503, 476 P.2d 702 (1970); *Mass v. Gordon,* 101 So. 2d 836, 837 (Fla. Dist. Ct. App. 1958). If the customer refuses to complete the transaction, the damages are the difference between the authorized purchase price and the amount realized upon a subsequent sale. *Herron,* at 503; *Mass,* at 837–38. As stated in *Herron*

> In dealings between a stockbroker and a customer, when an authorized purchase of stock is made by a broker, and the customer defaults by refusing to accept and pay for the stock, the broker has an election of remedies. He may treat the stock as the property of the customer, and sue for the full purchase price upon a tender of the stock; or, he may sell the stock promptly or within a reasonable time, and recover the difference between the purchase price and the amount received on such sale. If the broker chooses to retain the stock and treats it as his own, as was done in this instance, the second of those remedies is applicable, and the measure of his damages is the difference between the purchase price and the amount for which the stock could have been sold on the *date of default* or within a reasonable time thereafter.

*Herron,* at 503–04 (quoting *Mass,* at 837–38).

When Mr. England refused to pay for his stock, Shearson sustained losses because the stock declined in value. By

December 10, 1981, the stock value had decreased $23,968.75. Then Stymac purchased the stock at the price to which Mr. England had agreed, knowing the actual value of the stock was much less. By paying an extra $23,968.75, Stymac chose to "retain the stock" and intended to claim the difference against Mr. England. In short, Stymac paid the extra amount to obtain Shearson's chose in action against Mr. England; Shearson formally assigned its chose in action September 27, 1982. Since a right to damages for breach of contract is assignable, we conclude Stymac may assert Shearson's claim against the Englands. *See Portland Elec. & Plumbing Co. v. Vancouver,* 29 Wn. App. 292, 294, 627 P.2d 1350 (1981); 3 W. Jaeger, *Williston on Contracts* § 412, at 46–47 (3d ed. 1960).

We next address the Englands' contention that Ward Styner's violations of federal margin provisions preclude recovery for losses sustained from the unpurchased stock. Since this case involves federal securities laws, state court jurisdiction must be examined. Claims based on federal securities law must be brought in federal court under 15 U.S.C.A. § 78aa,[2] but that law may be asserted as a defense to a claim brought in state court. *Sherry v. Diercks,* 29 Wn. App. 433, 438–39, 628 P.2d 1336 (1981); *Sharehold-*

---

[2]15 U.S.C.A. § 78aa provides:

"The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. Judgments and decrees so rendered shall be subject to review as provided in sections 1254, 1291, and 1292 of Title 28. No costs shall be assessed for or against the Commission in any proceeding under this chapter brought by or against it in the Supreme Court or such other courts."

*ers Management Co. v. Gregory,* 449 F.2d 326, 327 (9th Cir. 1971); *Buckley v. Chicago Bd. Options Exch., Inc.,* 109 Ill. App. 3d 462, 440 N.E.2d 914, 917 (1982); *Birenbaum v. Bache & Co.,* 555 S.W.2d 513, 514–15 (Tex. Civ. App. 1977).[3] Mr. England's defense rests entirely upon the scope of the implied private remedies for violations of section 7 of the Securities Exchange Act of 1934 and Regulation T promulgated thereunder.

Section 7 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78g authorizes the Federal Reserve Board to regulate margin transactions and forbids violations of the Board's regulations. Regulation T, promulgated under authority of section 7, generally establishes the margin rate for security purchases at 50 percent, meaning that a purchaser generally must advance half of the purchase price of securities acquired "on margin." Regulation T also provided, in pertinent part:

> In case a customer purchases a security (other than an exempted security) in the special cash account and does not make full cash payment for the security within 7 days after the date on which the security is so purchased, the creditor[4] shall, except as provided in paragraphs (c)(3) through (7) of this section promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof.

12 C.F.R. § 220.4(c)(2) (1983).[5]

Prior to *Cort v. Ash,* 422 U.S. 66, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975), numerous courts had recognized a private right of action under section 7 and its regulations, yet none is explicitly granted by the act. *See, e.g., Goldman v. Bank of the Commonwealth,* 467 F.2d 439, 445–46 (6th Cir. 1972) (Regulation U); *Pearlstein v. Scudder & German,* 429 F.2d

---

[3]*See also* 2 L. Loss, *Securities Regulation* 977–80 (2d ed. 1961).

[4]A creditor is defined as a stockbroker and account executive. 12 C.F.R. § 220.2(b) (1984).

[5]12 C.F.R. § 220.4(c)(2) has been superseded by 12 C.F.R. § 220.4(c)(2), (3), effective March 31, 1984.

1136, 1139 (2d Cir. 1970) (Regulation T), *cert. denied,* 401 U.S. 1013, 28 L. Ed. 2d 550, 91 S. Ct. 1250 (1971).[6] In *Cort,* the Court set forth criteria for determining whether a statute implies a private right of action. The first *Cort* factor identifies whether the plaintiff is one "for whose *especial* benefit the statute was enacted", *Cort,* at 78; the second, and most important, is whether there is any indication of congressional intent to create a private remedy; the third is whether a private remedy is consistent with the legislative scheme; and the fourth is whether it would be inappropriate to infer a federal claim in an area traditionally relegated to state law. *Cort,* at 78; *Herman & MacLean v. Huddleston,* 459 U.S. 375, 74 L. Ed. 2d 548, 103 S. Ct. 683, 686–90 (1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 374–78, 72 L. Ed. 2d 182, 102 S. Ct. 1825, 1837 (1982).

Since *Cort,* every Circuit Court of Appeals considering this issue has denied investors a private remedy under section 7 and its regulations.[7] We agree.

 First, the legislative history and language of section

---

[6]*See also Daley v. Capitol Bank & Trust Co.,* 506 F.2d 1375 (1st Cir. 1974); *McCormick v. Esposito,* 500 F.2d 620 (5th Cir. 1974), *cert. denied,* 420 U.S. 912, 42 L. Ed. 2d 842, 95 S. Ct. 834 (1975); *Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365 (1st Cir.), *cert. denied,* 414 U.S. 1002, 38 L. Ed. 2d 237, 94 S. Ct. 356 (1973); *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 469 F.2d 1166 (8th Cir. 1972); *Palmer v. Thomson & McKinnon Auchincloss, Inc.,* 427 F. Supp. 915 (D. Conn. 1977).

[7]*Bassler v. Central Nat'l Bank,* 715 F.2d 308, 310 (7th Cir. 1983); *Walck v. American Stock Exch., Inc.,* 687 F.2d 778 (3d Cir. 1982), *cert. denied,* 461 U.S. 942, 77 L. Ed. 2d 1300, 103 S. Ct. 2118 (1983); *Gilman v. Federal Deposit Ins. Corp.,* 660 F.2d 688 (6th Cir. 1981) (Regulation U); *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 644 F.2d 1194 (6th Cir. 1981), *cert. denied,* 455 U.S. 909, 71 L. Ed. 2d 447, 102 S. Ct. 1256, *reh'g denied,* 455 U.S. 1008, 71 L. Ed. 2d 877, 102 S. Ct. 1647 (1982) (Regulation T); *Stern v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 603 F.2d 1073 (4th Cir. 1979) (Regulation T); *Utah State Univ. of Agriculture & Applied Science v. Bear, Stearns & Co.,* 549 F.2d 164 (10th Cir.), *cert. denied,* 434 U.S. 890, 54 L. Ed. 2d 176, 98 S. Ct. 264 (1977) (Regulation T); *Peters v. Prudential–Bache Sec., Inc.,* 572 F. Supp. 1085 (N.D. Ill. 1983); *Pierson v. Dean, Witter, Reynolds, Inc.,* 551 F. Supp. 497 (C.D. Ill. 1982); *see also* T. Hazen, *Securities Regulation* 288–89 (1985).

7 indicate Congress did not intend to create a remedy in favor of borrowers. The language of section 7 expressly announces the aim of "preventing the excessive use of credit for the purchase or carrying of securities" and of accommodating "commerce and industry, having due regard to the general credit situation of the country". 15 U.S.C.A. § 78g(a), (b). Nothing in the legislative history indicates Congress intended to provide a remedy for borrowers. The House Report accompanying the original bill noted:

> The main purpose of these margin provisions . . . is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly—although such a result will be achieved as a by-product of the main purpose.
>
> The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry—to prevent a recurrence of the pre-crash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry, and agriculture, were drained by far higher rates into security loans in the New York call market.

H.R. Rep. No. 1383, 73d Cong., 2d Sess. 8 (1934).

Rather than insuring investor protection through the establishment of maximum loan values, the sponsors of the bill pressed the macro-economic importance of the securities speculation and role of margin trading. Indeed, Congress ultimately abandoned an attempt to vest administrative powers in the Federal Trade Commission and instead provided the Federal Reserve Board this authority because it was thought better to insure the macro-economic objectives of the scheme. In short, the margin provisions merely provided "a supplementary instrument of credit policy—one of the means of making a broad credit and

monetary policy effective." Joint Committee on the Economic Report, 82d Cong., 2d Sess., *Monetary Policy and the Management of the Public Debt* 409 (Comm. Print 1952); *see also* Note, *Federal Margin Requirements as a Basis for Civil Liability,* 66 Colum. L. Rev. 1462, 1468–71 (1966). Thus, it appears Congress did not intend the margin provisions to serve a prophylactic function. While the provisions do regulate brokers and institutional lenders, such regulation does not necessarily provide investors extraordinary protection. The macro–economic purpose and regulatory nature of this section indicate members of the entire populace are intended beneficiaries.

Second, Congress amended the Securities Exchange Act with the addition of section 7(f) in 1970. 15 U.S.C.A. § 78g(f). This new section of the statute renders the investor equally responsible with the broker for compliance with the margin requirements.[8] Since borrowers now share with lenders the burden of observing margin requirements, the rationale for inferring a private claim has disappeared.

The legislative history reveals a congressional intent to preclude rather than provide a private remedy for individual borrowers. The fact that borrowers themselves are now regulated further indicates that section 7 was not enacted for their "especial benefit." *Piper v. Chris–Craft Indus., Inc.,* 430 U.S. 1, 37, 51 L. Ed. 2d 124, 97 S. Ct. 926, 947, *reh'g denied,* 430 U.S. 976, 52 L. Ed. 2d 371, 97 S. Ct. 1668 (1977).

Since violations of Regulation T do not necessarily afford Mr. England a private right of action, his contention is without merit. Even though Ward Styner and, therefore,

---

[8]*See Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 644 F.2d 1194 (6th Cir. 1981), *cert. denied,* 455 U.S. 909, 71 L. Ed. 2d 447, 102 S. Ct. 1256, *reh'g denied,* 455 U.S. 1008, 71 L. Ed. 2d 877, 102 S. Ct. 1647 (1982); *Utah State Univ. of Agriculture & Applied Science v. Bear, Stearns & Co.,* 549 F.2d 164, 170 (10th Cir.), *cert. denied,* 434 U.S. 890, 54 L. Ed. 2d 176, 98 S. Ct. 264 (1977); *see also* Note, *Implied Private Actions for Federal Margin Requirements: The Cort v. Ash Factors,* 47 Fordham L. Rev. 242 (1978); Comment, *Civil Liability for Margin Violation—The Effect of 7(f) and Regulation X,* 43 Fordham L. Rev. 93 (1974).

Stymac, may have violated Regulation T, these violations do not affect Stymac's claim against the Englands.

The judgment of the Superior Court is affirmed.

MUNSON and THOMPSON, JJ., concur.

Reconsideration denied May 13, 1985.