10 F.3d 1510
 Fed. Sec. L. Rep. P 98,050
SHEARSON LEHMAN BROTHERS, INC.,
Plaintiff-Counter-Defendant--Appellee-Cross-Appellant,
v.
M & L INVESTMENTS, a Utah General Partnership; Mike Strand;
Lois Strand,
Defendants-Counter-Claimants--Appellants-
Cross-Appellees.
 Nos. 91-4206, 91-4217.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 17, 1993.
 
 John T. Caine of Richards, Caine & Allen, Ogden, UT, for defendants-counter-claimants--appellants-cross-appellees.
 Terry Ross of Keesal, Young & Logan, P.C., Long Beach, CA (Robert D. Feighner and Shannon L. McDougald of Keesal, Young & Logan, P.C., Long Beach, CA, Reid Lewis of Moyle & Draper, P.C., Salt Lake City, UT, with him on the brief), for plaintiff-counter-defendant--appellee-cross-appellant.
 Before BALDOCK, HOLLOWAY and KELLY, Circuit Judges.
 BALDOCK, Circuit Judge.
 
 
 1
 Defendants M & L Investments ("M & L"), Mike Strand ("Strand") and Lois Strand appeal the district court's restitution award of 40,000 shares of stock, 776 F.Supp. 1489 (D.Utah 1991). Plaintiff Shearson Lehman Brothers, Inc. ("Shearson") cross-appeals the district court's determination that Shearson's Regulation T violation, 12 C.F.R. Sec. 220.8, served as an affirmative defense against Shearson's breach of contract action for stock nonpayment. We have jurisdiction over the appeal and cross-appeal[1] under 28 U.S.C. Sec. 1291.
 
 
 2
 M & L is a general partnership consisting of two partners, Strand and his wife, Lois. The Strands are Utah residents, and Mike Strand controlled all of the partnership's activities. He is a sophisticated stock market participant with substantial experience in securities trading who sometimes serves as a stock promotor. Shearson is a Delaware corporation with its principle place of business in New York.
 
 
 3
 In March 1986, Strand was approached by two individuals seeking to hire Strand to promote the stock issued by Atlantic Mining Corporation ("Atlantic Mining"). At that time, the stock was trading for substantially less than one dollar per share. Strand agreed to promote the stock, initially agreeing to raise its value to one dollar per share. Sometime in April 1986, Strand began buying and selling Atlantic Mining shares in an account held in M & L's name at Shearson. He successfully raised the value of the stock to one dollar per share within a few days by contacting acquaintances who were active in the stock market and touting the qualities of the stock.
 
 
 4
 Strand then agreed to raise the price to three dollars per share and later, to nine dollars per share. After the stock reached nine dollars per share, he continued promoting the stock but with no specific target price. By July 1986, the price of Atlantic Mining stock was at twelve dollars per share.
 
 
 5
 During the time Strand was promoting the stock, he purchased and sold the stock through the M & L account at Shearson. The M & L account was a "cash account," meaning that the customer must pay for any purchases made in the account at his direction within seven days. See 12 C.F.R. Sec. 220.8(b)(1)(i) (1991). The date on which payment is due is called the "settlement date."
 
 
 6
 Between April 21 and May 27, 1986, Strand purchased 72,000 shares of Atlantic Mining through his account at Shearson, of which he sold 2,800, giving him a net total of 69,200 shares. Though some of his payments were late, he had fully paid for the 69,200 shares by May 29, 1986.
 
 
 7
 Beginning in mid-May, Strand made frequent requests that Shearson deliver to him physical possession of the stock certificates representing the stock he had purchased. From what we can glean from the record, it appears that the transfer of physical possession takes some time to complete, usually between four and six weeks. Shearson placed Strand's request for the certificates, and on approximately June 22, 1986, Strand received two stock certificates which together represented 40,000 shares of Atlantic Mining stock. Although Strand continued to request physical possession of the certificates for the remaining 29,200 shares he had purchased through Shearson, Shearson never delivered these certificates.
 
 
 8
 From June 24 to 27, 1986, Strand placed an order or orders to buy 34,500 additional shares of Atlantic Mining stock through his Shearson account. Shearson purchased the shares for between eight and ten dollars per share, creating a debt of $318,886.41, which Strand failed to pay by the settlement date.
 
 
 9
 At the beginning of July, 1986, Shearson's Salt Lake office manager began discussing the M & L unpaid balance with Strand for the additional 34,500 shares. Strand represented to Shearson that he would soon pay his account balance, but payment was not received. The stock reached its peak value of nearly thirteen dollars per share at this time--i.e., near the beginning of July.
 
 
 10
 On approximately July 11, 1986, Shearson began liquidating the M & L account. This was approximately seven days after the settlement date--i.e., the date payment was due--for the ordered 34,500 shares. When Strand learned of the liquidation, he immediately ordered Shearson to stop and represented that he was arranging a loan to pay the outstanding balance. Based on Strand's representations, Shearson suspended the liquidation in mid-July, after it had been liquidating the account for approximately three business days and after only 4,500 shares had been sold.
 
 
 11
 At some point between mid-June and the end of July, Strand returned to Shearson the certificates he had previously received for the 40,000 shares of Atlantic Mining stock. Shearson contended at trial that Strand returned the certificates as a show of good faith on his overdue account. Strand asserts he returned the certificates for safe-keeping to await the arrival of the remaining certificates. When Strand returned the certificates, their market value was approximately $400,000.
 
 
 12
 Shearson continued to demand payment through the end of July but did not resume liquidation sales until negotiations with Strand for payment effectively stopped. On August 7, 1986, Shearson filed this breach of contract suit, and on September 19, 1986, Shearson liquidated all the remaining shares of Atlantic Mining in the M & L account at the market price of approximately fifty cents a share. After the liquidation, a debit balance of approximately $268,529.10 remained. In the district court, Strand filed a counter-claim for restitution of the 40,000 shares returned to Shearson in June or July and claimed as an affirmative defense to Shearson's breach of contract action that Shearson's recovery was barred because Shearson had violated applicable federal regulations--i.e., Regulation T, 12 C.F.R. Sec. 220.8--governing liquidation of cash accounts.[2]
 
 
 13
 Exercising diversity jurisdiction, the district court found that Shearson violated Regulation T by failing to promptly liquidate the M & L account after the seven-day settlement period had elapsed. Then, applying New York law, which was the parties' choice of law in their contract, the court held that Shearson's violation of Regulation T was an affirmative defense to Strand's breach. Thus, the court held that Strand did not have to pay the outstanding balance of $268,529.10. On Strand's claim for restitution of the stock certificates, representing the 40,000 shares for which he had already paid, the court ordered Shearson to return the certificates to Strand.
 
 I.
 
 14
 On appeal, Shearson asserts: (1) it did not violate Regulation T; (2) the parties waived reliance on New York law by relying exclusively on Utah and Tenth Circuit law in their representations to the district court; and (3) even if New York law applies, there is no affirmative defense for Regulation T violations under New York law. Therefore, Shearson argues, it is entitled to its damages for Strand's breach of contract. We address each argument in turn.
 
 
 15
 We first address Shearson's assertion that it did not violate Regulation T. With regard to cash accounts, Regulation T requires purchasers of stock to pay for the stock ordered within seven days of the day they placed the order for the stock. 12 C.F.R. Sec. 220.8. If the purchaser fails to make timely payment, Regulation T requires the holder of the account, in this case Shearson, to "promptly liquidate" the account. Id.[3] Thus, the determination of whether Shearson violated Regulation T depends upon whether Shearson promptly liquidated Strand's account. We review de novo the legal interpretation of terms in a federal regulation. Brabson v. Metropolitan Life Ins. Co., 795 F.2d 897, 899 (10th Cir.1986).
 
 
 16
 We agree with the district court's determination that Shearson failed to promptly liquidate the account. While there might be some situations in which it would be a close question as to whether a liquidation was prompt, Shearson's liquidation of M & L's account is not one of them. Shearson did not attempt to sell the shares until one week after payment was due under Regulation T--i.e., seven days after the seven-day settlement period had elapsed--and then left the shares on the market for only three days after selling only 4,500 shares. Furthermore, Shearson did not attempt to liquidate the balance of the M & L account again for two more months, at which time Shearson was able to liquidate the account, albeit for a much lower price than it had paid for the stocks.[4] Therefore, we hold that Shearson did not "promptly liquidate," thus violating Regulation T.[5] See Pearlstein v. Scudder & German, 429 F.2d 1136, 1139-40 (2d Cir.1970) ("it seems reasonably clear that defendant violated [Regulation T] when it failed in each instance to sell the bonds after seven business days had expired without payment"), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971).
 
 
 17
 To address Shearson's second argument--i.e., that the parties waived reliance on New York law by relying exclusively on Utah and Tenth Circuit law in their representations to the district court--we must first determine which law to apply to determine whether reliance on New York law was waived. We review choice of law determinations de novo. Mitchell v. State Farm Fire & Cas. Co., 902 F.2d 790, 792 (10th Cir.1990).
 
 
 18
 In making choice of law determinations, a federal court sitting in diversity must apply the choice of law provisions of the forum state in which it is sitting. Klaxon Co. v. Stentor Electric Mfg., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); Tucker v. R.A. Hanson Co., Inc., 956 F.2d 215, 217 (10th Cir.1992). This is true even when choice of law determinations involve the interpretation of contract provisions. See Devery Implement Co. v. J.I. Case Co., 944 F.2d 724, 727 (10th Cir.1991). Therefore, we apply Utah law to determine whether the contract provision, which specified application of New York law for contract disputes, was controlling.
 
 
 19
 Because Utah law has not yet definitively decided whether parties can stipulate to a choice of law in their contract, we must determine what Utah's highest court would do if faced with this issue. See Salve Regina College v. Russell, 499 U.S. 225, 236, 111 S.Ct. 1217, 1224, 113 L.Ed.2d 190 (1991). We believe that Utah, like other jurisdictions, would look to general contract principles to resolve the question of whether parties can stipulate to choice of law in their contract. It is generally recognized that:
 
 
 20
 [t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied ... unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties [sic] choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue which ... would be the state of the applicable law in the absence of an effective choice of law by the parties.
 
 
 21
 Restatement (Second) of Conflict of Laws, Sec. 187 (1971 & 1988 Revisions). See also Ferdie Sievers and Lake Tahoe Land Co., Inc. v. Diversified Mortgage Investors, 95 Nev. 811, 603 P.2d 270, 273 (1979); Jim v. CIT Financial Services Corp., 87 N.M. 362, 533 P.2d 751, 753 (1975); Schulke Radio Productions Ltd. v. Midwestern Broadcasting Co., 6 Ohio St.3d 436, 6 OBR 480, 453 N.E.2d 683, 686 (1983); Carmack v. Chemical Bank New York Trust Co., 536 P.2d 897, 899 (Okl.1975). Shearson's principle place of business is New York, so there is a reasonable basis for applying New York law. Furthermore, we can find no fundamental policy in the state of Utah[6] to dictate against the application of New York law in this case. Therefore, we hold that the parties' stipulation to New York law must be enforced absent waiver.
 
 
 22
 At this point, in order to determine conclusively whether New York law applies, we would normally address the status of Utah law with regard to waiver. However, we cannot address this issue because Shearson's appendix provides no evidence from which we can determine whether waiver even occurred. In its brief, Shearson cites us to no briefings to the district court nor to any portions of the transcript in which the parties cited Utah and Tenth Circuit law rather than New York law, and our own careful examination of the appendix uncovered none of these documents. It is counsel's responsibility to file an appendix "sufficient for consideration and determination of the issues on appeal and the court is under no obligation to remedy any failure of counsel to fulfill that responsibility." 10th Cir.R. 30.1 (as amended Oct. 25, 1990). Therefore, we decline to address the waiver issue and hold that New York law applies.
 
 
 23
 We now turn to New York law to determine whether Shearson's Regulation T violation provides Strand with an affirmative defense to Shearson's breach of contract claim. We review de novo the district court's determination of state law. Salve Regina, 499 U.S. at 231, 111 S.Ct. at 1221.
 
 
 24
 The district court determined that Shearson's Regulation T violation provided Strand with an affirmative defense to breach of contract, relying on Thomson McKinnon Securities, Inc. v. Hornung, 69 A.D.2d 118, 419 N.Y.S.2d 526 (1st Dept.1979). In so holding, the district court rejected a line of New York cases, which included Billings Assoc., Inc. v. Bashaw, 27 A.D.2d 124, 276 N.Y.S.2d 446 (4th Dept.1967). The court rejected Bashaw because it had not been cited in subsequent New York cases, unlike Hornung, which had been "cited favorably by at least one recent appellate decision"-- i.e., Berliner Handels-Und Frankfurter Bank v. Coppola, 172 A.D.2d 369, 568 N.Y.S.2d 751 (1st Dept.1991). However, the district court failed to observe that the Hornung and Berliner cases were both decided by the First Department of New York's intermediate appellate court while the Bashaw case was decided by the Fourth Department of New York's intermediate appellate court. Despite the chronology of the decisions, both the Hornung/ Berliner line of cases and the Bashaw case remain good law in New York, depending upon which department dictates a court's precedent. See N.Y. Statutes Sec. 72 (McKinney 1971 & Suppl.1993) ("[p]recedents do not lose their force by age alone," and "a decision of an appellate term of one judicial department is not binding on ... another department which has decided to the contrary"); see also Stewart v. Volkswagen of America, Inc., 181 A.D.2d 4, 584 N.Y.S.2d 886, 889 (2d Dept.1992) (per curiam) (appellate division department is free to decide contrary to another appellate division), rev'd on other grounds, 81 N.Y.2d 203, 597 N.Y.S.2d 612, 613 N.E.2d 518 (1993); Ross Bicycles, Inc. v. Citibank, NA, 149 A.D.2d 330, 539 N.Y.S.2d 906, 907 (1st Dept.1989) (same); People v. Finkelstein, 12 A.D.2d 457, 207 N.Y.S.2d 389, 389-90 (1st Dept.1960) (per curiam) (decision of Appellate Division Second Department is not controlling on the First Department because it is not decision of highest state court), rev'd on other grounds, 9 N.Y.2d 342, 214 N.Y.S.2d 363, 174 N.E.2d 470 (1961); Brown v. Village of Albion, 128 Misc.2d 586, 490 N.Y.S.2d 958 (Sup.1985) (if appellate division rulings conflict, trial court must apply law of its own appellate division); People v. Reshes, 39 Misc.2d 723, 242 N.Y.S.2d 416 (Crim.Ct.1963) (same). Therefore, the district court erroneously determined that New York law required it to follow the Hornung case. Because New York law regarding an affirmative defense under Regulation T remains unsettled, we must now decide which rule of law New York's highest court would apply. See Salve Regina, 499 U.S. at 236, 111 S.Ct. at 1224.
 
 
 25
 The relatively few courts that have addressed this issue, with the exception of New York's Appellate Division First Department, have held that there is no affirmative defense to breach of contract for Regulation T violations. See Bache Halsey Stuart, Inc. v. Killop, 509 F.Supp. 256, 259 (E.D.Mich.1980); Gregory-Massari, Inc. v. Purkitt, 1 Cal.App.3d 968, 82 Cal.Rptr. 210 (1969); Shearson Hayden Stone, Inc. v. Feldman, 109 Misc.2d 403, 439 N.Y.S.2d 975, 977 (Civ.Ct.1980); Styner v. England, 40 Wash.App. 386, 699 P.2d 234, 238 (1985). Because this rule of law is most consistent with the policy behind Regulation T and other regulations which protect the market in general, we believe New York's highest court would adopt the rule which does not allow an affirmative defense to breach of contract for Regulation T violations.
 
 
 26
 Regulation T and other such regulations were enacted to protect the general economy from the infusion of prohibited credit. Bache, 509 F.Supp. at 259. Thus, the purpose of Regulation T is to benefit the market in general, not to benefit individual investors. Styner, 699 P.2d at 238. Similar regulations govern the actions of clients, placing an equal burden for complying with margin requirements on both brokers, such as Shearson, and clients, such as Strand. Id. at 239 (citing Regulation X, 12 C.F.R. Sec. 224, which prohibits any person from obtaining credit when to do so would cause the creditor to violate Regulation T, and also citing 15 U.S.C. Sec. 78g(f), which declares it illegal for any person to obtain, receive or enjoy the extension of credit in connection with the purchase of securities contrary to the Federal Reserve System regulations); see also Feldman, 439 N.Y.S.2d at 977. Thus, because the regulations place the burden of margin requirement compliance equally upon broker and client, it is inconsistent to place the entire burden of compliance upon brokers in contract disputes. Cf. Bennett v. United States Trust Co. of New York, 770 F.2d 308 (2d Cir.1985) (holding that there is no private cause of action against a broker under Regulation T because both client and broker are equally responsible for violating margin requirements), cert. denied, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); Stern v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 603 F.2d 1073 (4th Cir.1979) (same); Utah State University v. Bear, Stearns & Co., 549 F.2d 164 (10th Cir.) (same), cert. denied, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977). Clients, who have necessarily violated their own regulations if their broker has violated Regulation T, should not be allowed to benefit from their broker's violation. Feldman, 439 N.Y.S.2d at 977. Thus, while Shearson's violation of Regulation T might affect the amount of damages it can recover for Strand's alleged breach, see id. at 978, it is not an affirmative defense to Shearson's breach of contract claim.
 
 
 27
 Because we find no affirmative defense for Regulation T violations under New York law, we reverse the district court's dismissal of Shearson's breach of contract claim and remand to the district court for further proceedings.
 
 II.
 
 28
 Defendants M & L and the Strands assert only one argument on appeal-- i.e., that the district court erred in determining that they were entitled only to the return of the 40,000 shares they had given to Shearson, rather than return of the shares plus damages in the amount of the difference between the shares' value in late July (when Strand asserts he would have sold them) and their value when Strand received the shares at the close of trial. However, in their complaint, Defendants' only requested relief with regard to the 40,000 shares was "delivery to [M & L and the Strands] of the certificates representing the 40,000 shares of Atlantic Mining stock," "court costs and reasonable attorney's fees," and "any other relief the court deems just and proper." Because Defendants failed to assert their damages claim below and because we do not think that the district court was required to guess that Defendants desired damages under their "just and proper" relief request, we decline to award such relief on appeal. See Blondo v. Bailar, 548 F.2d 301, 305 (10th Cir.1977) (relief not requested below cannot be asserted for the first time on appeal).
 
 
 29
 We AFFIRM the district court's decision to award restitution of the stock certificates representing 40,000 shares of stock, we REVERSE the court's dismissal of Shearson's breach of contract claim, and we REMAND for further proceedings consistent with this opinion.
 
 
 
 [1]
 This court initially questioned whether it had jurisdiction over Shearson's cross-appeal because it was unclear from the district court docket sheet whether Shearson's notice of cross-appeal was timely filed. Fed.R.App.P. 4(a)(3) provides:
 If a timely notice of appeal was filed by a party, any other party may file a notice of appeal within 14 days after the date on which the first notice of appeal was filed....
 M & L filed a timely notice of appeal on November 25, 1991, and Shearson filed its notice of appeal on December 9, 1991, within 14 days of M & L's notice. However, the district court clerk did not enter Shearson's notice on the docket sheet until December 13, 1991. Because the date the clerk received the notice of appeal is the date we use to determine timeliness, see Fed.R.App.P. 25(a), we conclude that Shearson timely filed its notice of appeal, giving us jurisdiction over its cross-appeal.
 
 
 [2]
 Both parties submitted other claims to the district court which the parties do not appeal
 
 
 [3]
 Regulation T, 12 C.F.R. Sec. 220.8 provides in relevant part:
 (a) Permissible transactions. In a cash account, a creditor may:
 (1) Buy for or sell to any customer any security if: (i) There are sufficient funds in the accounts; or (ii) the creditor accepts in good faith the customer's agreement that the customer will promptly make full cash payment for the security before selling it and does not contemplate selling it prior to making such payment; ....
 ....
 (b) Time periods for payment: cancellation or liquidation--(1) Full cash payment. A creditor shall obtain full cash payment for customer purchases within 7 business days of the date:
 (i) any nonexempted security was purchased; ....
 ....
 (4) Cancellation: liquidation: minimum amount. A creditor shall promptly cancel or otherwise liquidate a transaction or any part of a transaction for which the customer has not made full cash payment within the required time....
 
 
 [4]
 We understand Shearson's argument that the market was unable to absorb all of the Atlantic Mining shares held in the M & L account because Strand was creating and manipulating the only market for Atlantic Mining stocks. However, when all the evidence is considered, we think the facts support the finding that Shearson failed to even attempt to promptly liquidate all the stocks
 
 
 [5]
 In support of its argument that it did not violate Regulation T, Shearson cites Shearson Hayden Stone, Inc. v. Leach, 583 F.2d 367 (7th Cir.1978), and Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brooks, 548 F.2d 615 (5th Cir.), cert. denied, 434 U.S. 855, 98 S.Ct. 173, 54 L.Ed.2d 126 (1977). We find these cases irrelevant to this determination. Both cases address the effect of a violation of a Chicago Board of Trade regulation, not of Regulation T. Furthermore, the cases do not hold that no violation occurred but merely hold that a client's failure to object to a broker's violation of a regulation waives the client's right to use the broker's violation as a defense to breach of contract
 
 
 [6]
 It is unclear whether Utah would apply the lex loci contractus--i.e., place where contract was made--test or the "most significant relationship" test to determine the law applicable to a contract dispute. See Mountain Fuel Supply v. Reliance Ins. Co., 933 F.2d 882, 888 (10th Cir.1991). However, under either test, Utah law would be the law applicable to the Shearson-M & L contract dispute absent the New York choice of law provision