THOMSON McKINNON SECURITIES, INC., Appellant, v PAUL HORNUNG, Doing Business as RAINBOW RESEARCH CO., Respondent.

First Department, July 10, 1979

## APPEARANCES OF COUNSEL

*Edward J. Boyle (William C. Bieluch, Jr.,* with him on the brief; *Hall, McNicol, Hamilton & Clark,* attorneys), for appellant.

## OPINION OF THE COURT

BLOOM, J.

This is an action by a registered security broker against a customer to recover for losses incurred as a result of a "short sale" made by the customer.

Defendant is a rather sophisticated trader in securities who maintained multiple accounts with numerous security dealers. Plaintiff is one such dealer. In the early part of January, 1975, defendant instructed plaintiff to sell for his account 2,000 shares of stock of a firm known as Medtronic, Inc. That sale was effected on January 10, 1975. On January 21, 1975, pursuant to defendant's instructions, an additional 1,000 shares were sold. The final transaction occurred on January 23, 1975, when another block of 1,000 shares was sold. All of the sales were effected through plaintiff's Cincinnati office.

At the time the sales were made by plaintiff, plaintiff contends that it was under the impression that defendant owned the stock sold, i.e., the the sales were "long sales". Beginning February 3, 1975, plaintiff's New York office made inquiries of its Cincinnati office seeking information as to when the shares would be delivered. These culminated in a wire dated February 25, 1975, which noted that the transactions were now "35 days old" and requested advice with respect to delivery of the shares inasmuch as the account was "liable to a buy in and any loss resulting therefrom".

On March 5, 1975, defendant, realizing that the rise in the price of Medtronic shares had placed him in a position where he could no longer cope with the situation, requested a meeting with plaintiff. At that meeting, which took place the

following day, defendant explained his situation to plaintiff. Thereupon, the same day, plaintiff purchased 4,000 shares of Medtronic for the account of defendant. The net loss resulting from the purchase was $52,019.44. It is this sum which plaintiff now seeks to recover from defendant.

Trial Term, relying on *Pearlstein v Scudder & German (Pearlstein I)* (429 F2d 1136, cert den 401 US 1013) found in favor of defendant and rendered judgment accordingly. We affirm, although for reasons other than those relied on by Trial Term.

Under subdivision (a) of section 7 of the Securities Exchange Act of 1934 (US Code, tit 15, § 78g, subd [a]) the Board of Governors of the Federal Reserve System is empowered to "prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security". Pursuant to the authority so conferred, the Board of Governors of the Federal Reserve System adopted its regulation T. The provision of that regulation here applicable (12 CFR 220.4 [c]) specifies that "(1) In a special cash account, a creditor may effect for or with any customer bona fide cash transactions in securities in which the creditor may: * * * (ii) Sell any security for, or purchase any security from, any customer, provided the security is held in the account or the creditor is informed that the customer or his principal owns the security and the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the security is to be promptly deposited in the account."[1]

A sell order is required to be settled within seven days after the sale. Under rule 15c3-3(m) of the Securities and Exchange Commission (17 CFR 240.15c3-3[m]) "If a broker or dealer executes a sell order of a customer (other than an order to execute a sale of securities which the seller does not own) and if for any reason whatever the broker or dealer has not obtained possession of the securities from the customer within

---

1. The proof indicates that defendant never informed plaintiff that he owned the security or that the sales in question were "short sales". Additionally, there is no indication of any agreement that the security was promptly to be deposited by defendant in his account. Indeed, there is no indication of any inquiry by plaintiff until the interoffice communications referred to. Similarly, no inquiry was made by plaintiff as to whether the sales were "short" or "long". Hence, it is clear that plaintiff was in violation of regulation T. However, the trial court, moved by a scrupulous sense of fairness, treated the sales as if they were "long sales". To give plaintiff the benefit of any doubt, we so treat them here.

10 business days after the settlement date, the broker or dealer shall immediately thereafter close the transaction with the customer by purchasing securities of like kind and quantity".

Thus, the settlement date of the January 10, 1975 sale of 2,000 shares of Medtronic was January 17, 1975. The 10-day extension provided by rule 15c3-3(m) mandated a buy-in by plaintiff by January 31, 1975. With respect to the sale of 1,000 shares on January 21, the settlement date was January 28, with the mandatory buy-in date fixed at February 11. With respect to the final sale, which took place on January 23, the settlement date was January 30, with the final buy-in date fixed at February 13, 1975. In short, under SEC rule 15c3-3(m), all elements of the last of the three transactions should have been closed out by February 13, 1975.[2] In fact, the close out did not occur until March 6, 1975, almost five weeks after the close out date of the first transaction, and three weeks after the close out date of the last transaction. We are thus brought face to face with the effect of a violation of regulation T and the rules and regulations of the SEC upon private rights in an action to recover for loss suffered by consequence thereof.

Subdivision (c) of section 7 of the Securities and Exchange Act (US Code, tit 15, § 78g, subd [c]) prohibits a broker or dealer from extending credit (1) on any security in contravention of rules and regulations adopted by the Board of Governors of the Federal Reserve System; and (2) without collateral or on any collateral other than securities, except in accordance with such rules and regulations. Plaintiff's failure to close out these three transactions within the time limited by regulation T and the rules and regulations of the SEC was a clear violation of the law. "The federal securities laws charge brokers and dealers with knowledge of the margin requirements and with the duty to obey them. No broker can conscientiously claim to have been misled into extending credit beyond the seven-day limit absent some misstatement of fact by his customer regarding the customer's use of the money

---

2. Regulation T (12 CFR 220.4 [c] [6]) and SEC rule 15c3-3(m) authorize a national securities exchange to grant a limited extension of time in "exceptional circumstances" to buy in a security. However, Trial Term found that no such extension was ever granted, a finding amply supported by the record. While a request dated February 5, 1975 was received in evidence, there is nothing to indicate what action was taken thereon, or if, indeed, it was ever submitted to a national securities exchange.

loaned * * * a circumstance which is not present here". *(Pearlstein I, supra,* p 1141.) While recognizing that this holding placed the customer in a favored position, the opinion pointed out that the "danger of permitting a windfall to an unscrupulous investor is outweighed by the salutary policing effect which the threat of private suits for compensatory damages can have upon brokers and dealers above and beyond the threats of governmental action by the Securities and Exchange Commission" (p 1141). Judge FRIENDLY, who wrote a vigorous dissent, noted that, assuming that the public policy enunciated in subdivision (c) of section 7 of the act was served by a degree of private enforcement, "speculators will be in a position to place all the risk of market fluctuations on their brokers, if only the customer's persuasion or the broker's negligence causes the latter to fail in carrying out Regulation T to the letter. Any deterrent effect of threatened liability on the broker may well be more than offset by the inducement to violations inherent in the prospect of a free ride for the customer who, under the majority's view, is placed in the enviable position of 'heads-I win-tails-you lose' " (p 1148).

Whether impressed by the force of Judge FRIENDLY's reasoning or otherwise, the Congress, within three months after the decision in *Pearlstein I,* amended section 7 of the act by adding thereto subdivision (f) which provides that it is unlawful for a person "to obtain, receive or enjoy the beneficial use of a loan or other extension of credit from any lender" for the purpose of engaging in transactions otherwise proscribed (US Code, tit 15, § 78g, subd [f]). To effectuate the purposes of this amendment, the Board of Governors of the Federal Reserve System adopted regulation X (12 CFR 224 *et seq.).* In pertinent part this regulation imposes upon customers the same limitations upon receiving credit as are imposed upon brokers and dealers in extending credit (12 CFR 224.2 [a] [2]).

The courts soon recognized that the addition of subdivision (f) of section 7 had the effect of destroying the customer's "enviable position of 'heads-I win-tails-you lose' ". A customer who violated the credit restrictions of regulation X could no longer seek redress from the broker *(Utah State Univ. of Agriculture & Applied Science v Bear, Stearns & Co.,* 549 F2d 164; *Drasner v Thomson McKinnon Securities,* 433 F Supp 485; *Freeman v Marine Midland Bank,* 419 F Supp 440; *Bell v Winer & Co.,* 392 F Supp 646). Indeed, when *Pearlstein II (Pearlstein v Scudder & German,* 527 F2d 1141) was before the

Court of Appeals on the issue of damage, that court took the occasion to comment that "the addition of section 7(f) to the Exchange Act in 1970, 15 U.S.C. 78g(f), as well as the promulgation by the Federal Reserve Board of Regulation X, 12 C.F.R. § 224 (1975), have now made it unlawful to *obtain* credit in violation of the margin requirements. The effect of these developments is to cast doubt on the continued viability of the rationale of our prior holding" (p 1145, n 3; italics in original).

However, to say that subdivision (f) of section 7 bars actions by the customer is not to say that it confers a right of action upon the broker or dealer. Palpably, it was not the purpose of the Congress to reverse the relative juridical positions of the parties by reviving the broker's cause of action, while denying such relief to the customer. Its ostensible intent was to equalize their status before the law.

Here, plaintiff and defendant have each violated the law. Each is experienced in the ways of speculation. The parties are, therefore, *in pari delicto* (Civil Liability for Margin Violations—The Effect of Sections 7(f) and Regulation X, 43 Fordham L Rev 93, 99 *et seq.*), and neither is entitled to invoke the aid of the court.

The Congress, and the institutions created by it for that purpose, have mandated the standards of behavior applicable to the situation here presented. Those standards will not consciously be lowered by any judgment of this court.

Accordingly, the judgment appealed from should be affirmed, with costs.

BIRNS, J. P. (dissenting). I dissent. While I essentially agree with the factual and legal presentation in the majority opinion, I disagree with the result reached. I would reverse and award judgment to plaintiff, but only for the damages incurred as of January 31, 1975.

The question presented on this appeal is whether a stock sale transaction is void, and unenforceable against the defendant customer, when the plaintiff brokerage firm is in technical, nonwillful violation of Federal Reserve Board regulation T. The regulation provides that in a special cash account a creditor may sell a security for a customer provided the security is either held in the account, or the creditor is informed that the customer or his principal owns the security

and the creditor believes, in good faith, that the security is to be promptly deposited in the account.

In the present case the defendant was a sophisticated trader in securities and was also a registered representative. In 1974 he had actively traded Medtronic stock, having bought or sold between 60,000 and 80,000 shares using between 15 and 20 firms to conduct the trades. Defendant maintained a "delivery-versus-payment" special cash account with plaintiff, using a bank as a clearing agent to accept delivery of sold stock for transmittal to plaintiff.

On January 10, 21 and 23, 1975, defendant directed plaintiff to sell a total of 4,000 shares of Medtronic stock for his account. The record is somewhat unclear whether defendant was "short" or "long" in Medtronic at the time he directed plaintiff to sell the shares, but the majority, exercising its function as fact finder, has treated the transactions as "long sales", i.e., that plaintiff owned the securities when they were sold. Nevertheless, the majority concludes that plaintiff was in violation of regulation T because "there is no indication of any agreement that the security was promptly to be deposited by defendant in his account." It is upon this basis that the majority concludes that plaintiff may not recover any of the $52,019.44 it sustained as damages when defendant failed to deliver the stock.

The "per se unenforceable" rule announced by the majority places the defendant customer in the enviable position of "heads-I-win, tails-you-lose" criticized by Judge FRIENDLY, dissenting in the no longer valid *"Pearlstein I" (Pearlstein v Scudder & German,* 429 F2d 1136, 1148). If the Medtronic stock had gone down, instead of up, defendant could have purchased replacement shares in the open market at a reduced price, delivered them to plaintiff, and realized his profit. He would not even have had to touch his own shares assuming, as the majority has, that defendant was "long" when he directed plaintiff to sell. On the other hand, since the Medtronic shares went up, instead of down, defendant is now free to claim that he need not deliver the shares, and plaintiff cannot collect damages for replacing those shares at a higher price, because plaintiff cannot establish an "agreement that the security was promptly to be deposited by defendant in his account" and was therefore in technical violation of regulation T. I do not share the majority's view of this result as affording the parties equal status before the law.

I would hold that the technical, nonwillful violation of regulation T does not operate to divest plaintiff of its entire cause of action (see *Weis & Co. v Offenberger,* 31 Misc 2d 628; *Fisch v Banks,* 58 Misc 2d 839). The damages should be the difference between the sale price on the respective sale dates, and the price on the date when plaintiff should reasonably have bought in, and thereby mitigated the resultant damages (see *Billings Assoc. v Bashaw,* 27 AD2d 124; *Merrill Lynch, Pierce, Fenner & Smith v Jordan,* NYLJ, April 12, 1978, p 10, col 3; *Merrill Lynch, Pierce, Fenner & Smith v Jordan,* NYLJ, April 9, 1979, p 14, col 2). Since SEC rule 15c3-3(m) requires a buy-in "within 10 business days after the settlement date", I would fix that date as January 31, 1975 (the final buy-in date for the January 10 transaction which had a settlement date of January 17).* The reason I would not extend the buy-in dates further is that plaintiff had real or constructive notice, as of January 31, that defendant did not have Medtronic stock to deliver. It would have been unreasonable for plaintiff to have bought in 2,000 shares on January 31, because of the default on the first sale, and then waited until February 11 and February 13 to close out the January 21 and January 23 transactions. In these circumstances, the transactions all having been in Medtronic, Inc. shares, the first default should serve as a notice of probable default in the subsequent transactions. After January 31, 1975, plaintiff should no longer enjoy the benefit of the majority's treatment of these transactions as "long sales" (see *Naftalin & Co. v Merrill Lynch, Pierce, Fenner & Smith,* 469 F2d 1166, 1176-1178, 1181-1182).

In conclusion, I observe that even under *Pearlstein I (supra)* the plaintiff herein may have been able to collect the measure of damages which I believe to be appropriate. In a footnote to the majority opinion in that case (429 F2d 1136, 1141-1142, n 9) the court stated: "Several cases cited by defendant deal not with the investor's right to recover for the broker's failure to sell unpaid-for securities after seven days, but rather with the broker's right to sue for the original contract price after plaintiff has failed to tender payment and the broker has accordingly sold the securities on the investor's account [citing Federal and New York State cases]. Pearlstein does not contest his liability for the original contract price, but rather

---

* Plaintiff's violation of SEC rule 15c3-3(m) (failure to buy in on time) cannot divest plaintiff of a cause of action, and resultant damages, which had accrued prior to plaintiff's first violation of the rule.

seeks to limit his loss to that which he would have sustained had defendant sold the bonds after seven days."

If this approach were to be applied to the case at bar, it would support a holding that defendant herein is liable for the damages sustained by plaintiff resulting from defendant's failure to deliver the 4,000 shares of Medtronic stock, limited to the loss plaintiff would have sustained had plaintiff "bought in" on January 31, 1975, i.e., within 10 business days after the settlement date of the first transaction (SEC rule 15c3-3[m]). I would reverse and grant judgment to plaintiff.

FEIN and LUPIANO, JJ., concur with BLOOM, J.; BIRNS, J. P., and LANE, J., dissent in an opinion by BIRNS, J. P.

Judgment, Supreme Court, New York County, entered on April 14, 1977, affirmed. Respondent shall recover of appellant $75 costs and disbursements of this appeal.