SHEARSON LEHMAN BROTHERS, INC., a corporation, Plaintiff,

v.

M & L INVESTMENTS, a Utah partnership, et al., Defendants.

M & L INVESTMENTS, a Utah partnership, et al., Counterclaimants,

v.

SHEARSON LEHMAN BROTHERS, INC., a corporation, Counterdefendant.

Civ. No. 86–C–692J.

United States District Court, D. Utah, C.D.

Oct. 24, 1991.

Terry Ross, Shannon McDougald, Keesal, Young & Logan, Long Beach, Cal., Jeffrey Robinson, Moyle & Draper, Salt Lake City, Utah, for plaintiff/counterclaim defendant.

John T. Caine, Richards, Caine & Allen, Ogden, Utah, for defendants/counterclaimants.

## MEMORANDUM OPINION

ALDON J. ANDERSON, Senior District Judge.

On April 16–19, 1991, this court held a bench trial in the above-captioned matter. Plaintiff/Counter-claim-defendant Shearson Lehman Brothers, Inc., was represented by Terry Ross and Shannon McDougald of Keesal, Young & Logan, Long Beach, Cali-

fornia, and Jeffrey Robinson of Moyle & Draper, Salt Lake City, Utah, as local counsel. Defendants/Counter-claimants M & L Investments, Mike Strand and Lois Strand were represented by John T. Caine of Richards, Caine & Allen, Ogden, Utah.[1] At the close of the evidence, the court continued the trial until May 31, 1991, at which time the parties presented closing arguments to the court. The parties later submitted proposed findings of fact and conclusions of law. The court then took the matter under advisement. Having carefully reviewed the evidence, relevant authority, and the briefing of the parties, the court is prepared to render its decision.

## I. FACTS

This case arises out of the purchase of securities by Plaintiff for Defendants for which Defendants never paid Plaintiff. Defendant M & L Investments is a general partnership consisting of only two partners, Defendant Mike Strand and his wife Defendant Lois Strand. Mike Strand ("Strand"), however, controlled M & L Investments' relevant activities. In March of 1985 Strand opened a trading account for M & L Investments with Plaintiff Shearson Lehman Brothers, Inc. ("Shearson").

Strand is a sophisticated participant in the over-the-counter stock market with substantial experience in the trading of securities. Strand has extensive contacts in the over-the-counter securities community and sometimes serves as a promoter of stocks. In March of 1986, George Perry and Lois Crowder approached Strand with a business proposition. Perry and Crowder sought to "hire" Strand to promote the stock issued by Atlantic Mining Corporation ("Atlantic Mining"). At that time, Perry and Crowder both owned shares of Atlantic Mining and the stock was trading for substantially less than one dollar per share.

After some investigation and contemplation, Strand entered a series of agreements with Perry and Crowder to promote Atlantic Mining stock and raise its price-per-share trading value. Strand first agreed to raise the price of Atlantic Mining shares to one dollar per share. Strand was able to accomplish this goal within a few days, essentially by contacting acquaintances who were active in the market and touting the qualities of the stock. Strand subsequently agreed to raise the price to three dollars per share and then to nine dollars per share. After the stock reached nine dollars per share, Strand continued promoting Atlantic Mining stock but with no specific target price set by Perry and Crowder. Strand claims responsibility for having raised the price of Atlantic Mining stock to twelve dollars per share by July of 1986.

During the time Strand was promoting Atlantic Mining, he was purchasing and selling the stock through the M & L Investments account at Shearson. The M & L Investments account was a "cash account." In a cash account, the customer must pay for any purchases made in the account at his direction within seven days. *See* 12 C.F.R. § 220.8(b)(1)(i) (1991). The date on which payment is due is known as the "settlement date." The purchases of Atlantic Mining that Strand made in this account are the subject of this lawsuit.

Between April 21 and May 27 of 1986, Strand purchased 72,000 shares of Atlantic Mining through the M & L Investments account at Shearson. During that same time, Strand sold 2,800 shares of Atlantic Mining giving him a net total of 69,200 shares. Though some payments were late, Strand had fully paid for the 69,200 shares in the M & L Investments account by May 29, 1986. Plaintiff's Exhibit 14.

Beginning in mid-May, Strand made frequent requests of Shearson that it deliver to him physical possession of stock certificates representing the stock he had purchased and for which he had paid. Strand did not tell Shearson why he wanted physical possession of the certificates. To obtain physical certificates for Strand, Shearson had to initiate a process known as "transfer." In general terms, the transfer process begins with the local office inform-

---

**1.** This case originally was assigned to the Honorable Bruce S. Jenkins. In a prior proceeding Judge Jenkins entered a default judgment against George Perry, one of the original defendants, on July 20, 1988. Perry, therefore, was not represented at the trial.

ing the main office of the request for certificates. The main office then would have contacted the relevant clearing house to request certificates. In this case, the Depository Trust Corporation served as the clearing house for the trade in Atlantic Mining. The Depository Trust Corporation then should have contacted the designated transfer agent for Atlantic Mining. The transfer agent would then arrange to have the stock certificates issued in the name of the buyer and sent through the same chain of entities eventually to the stock's owner. Understandably, this transfer process takes some time to be completed. The office manager of Shearson's Salt Lake City office testified that the transfer process normally takes four to six weeks to be completed. Trial Transcript, Testimony of Karen Heaps at 10.

Shearson apparently put Strand's stock into transfer as instructed. Strand received two stock certificates on approximately June 22, 1986, representing 40,000 shares of the 69,200 shares of Atlantic Mining he had purchased through Shearson. Defendants' Exhibit 6. As the testimony was unclear regarding the date on which the stock was put in transfer and imprecise regarding the date of arrival, the 40,000 shares of stock arrived between three and one-half to seven weeks after requested.[2] Strand continued to request physical certificates for the remainder of the shares that he had purchased through Shearson. Shearson never delivered stock certificates to Strand for the remaining 29,200 shares of Atlantic Mining stock for which Strand paid.

On June 24, 25, 26, and 27 Strand issued purchase orders to Shearson for a total of 34,500 shares of Atlantic Mining in addition to the 69,200 shares previously ordered. Strand failed to pay for these purchases. Shearson made the purchases for Strand at between eight and ten dollars per share creating a debt, including commissions, of $318,886.41.[3] At the start of July, Mr. Burgon, the Salt Lake office manager for Shearson, began discussing with Strand the unpaid balance in the M & L Investments account. The stock reached its peak value of near thirteen dollars per share at this time. Strand represented to Shearson that payment would soon arrive. Strand's payment, however, failed to materialize. Shearson began to liquidate the account on approximately July 11, 1986,[4] which, by the court's calculation, was seven days after the settlement date for Strand's final purchase order, or fourteen days after he ordered the purchases. Strand learned of the liquidation and immediately contacted Shearson to demand that it stop. Strand represented to Burgon, the local office manager for Shearson, that he was arranging a loan through Mr. Neuman Petty to pay the outstanding balance. Based on Strand's representations, Shearson suspended the liquidation sales in the M & L Investments account in mid-July. Shearson suspended the liquidation after it had been liquidating the account for approximately three business days and after only 4,500 shares were sold.

Shearson believed Strand was arranging a form of financing known as a "delivery versus payment" through Neuman Petty's account at a specified bank. In a delivery versus payment arrangement, the brokerage would deliver legal ownership of a stock (not necessarily physical certificates) to the lender in exchange for an agreed

---

**2.** By May 2nd, Strand had placed the purchase order for the original 40,000 shares. Strand did not pay for the 40,000 shares, however, until May 19th. Additionally, Strand's account had an outstanding balance due until May 29th. *See* discussion of pay-out limitation *infra*. The court does not know on or near which of these dates Shearson put Strand's 40,000 shares in transfer.

**3.** The court finds errors in the numbers submitted by counsel for the parties and has arrived at its figures by careful review of Plaintiff's Exhibits 14, 17, and 22 assisted by the testimony and arguments. The balances presented by Plaintiff's counsel appear to include $2,316.06 Strand owed on a stock that was not the subject of the claims and evidence presented at trial. The court has, therefore, reduced the debit balance correspondingly. Defendants' Exhibits 1 and 2 relating to these issues contain numerous errors and the court does not rely on them.

**4.** *See* Plaintiff's Exhibit 17, trade confirmation slips.

amount of money. The money is considered a loan to the brokerage's customer secured by the stock. The bank would hold legal title to the stock to guard its security interest, and the brokerage's customer would owe the bank principal in the amount of the payment to the brokerage. Since the brokerage house would be paid for the stocks by the bank, it would have no further involvement. To execute such a delivery versus payment, a number of details necessarily must be arranged. During the middle of July, a Shearson employee made daily inquiries of the identified bank to determine whether Petty and Strand had made the necessary arrangements and issued authorization for the delivery versus payment to occur. The bank received no instructions or authorization from Mr. Petty or Strand. The overdue M & L Investments account balance at Shearson remained unpaid.

At some point between mid-June and the end of July, Strand returned to Shearson the certificates for the 40,000 shares of Atlantic Mining that he had previously received. Shearson contends that Strand returned the certificates after his account was overdue as a sign of good faith. When Strand returned the certificates, their market price value was approximately $400,000. Strand asserts that he returned the certificates for safe-keeping to await the arrival of the certificates representing the other stock he had ordered through Shearson.

Shearson continued to demand payment from Strand and attempt to resolve the overdue account balance through the end of July. Shearson did not resume liquidation sales in the M & L Account when negotiations with Strand effectively stopped. Shearson filed this lawsuit for payment on August 7, 1986. On September 19, Shearson liquidated all of the remaining shares of Atlantic Mining in the M & L Investments account at the market price of approximately fifty cents a share. More than two months had passed since Shearson's last liquidation sale in the M & L Investments account. After the liquidation, a debit balance of approximately $268,529.10 remained representing purchases of Atlantic Mining Stock for which Shearson had not been paid.

Shearson brought this action essentially claiming that Strand breached his written contract with Shearson by failing to pay for the Atlantic Mining stock he ordered in late June. Shearson also asserts a claim for fraud and other miscellaneous claims against Strand and M & L Investments. Strand counterclaimed for damages against Shearson for breach of contract. Strand asserts that Shearson breached its contract with Strand by failing to deliver the stock certificates representing the 29,200 shares of stock for which he had paid in full by the end of May. Strand seeks restitution of the certificates representing 40,000 shares of Atlantic Mining stock that he returned to Shearson in late June or early July. Strand also asserts that Shearson's failure to deliver the stock certificates excused his failure to pay for the 34,500 shares purchased on June 24–27. Finally, Strand alleges that Shearson failed to properly mitigate its damages in that it did not properly liquidate the M & L Investments account. Strand argues that Shearson failed to comply with the applicable federal regulations relating to margin requirements. Specifically, Strand alleges that if Shearson had immediately liquidated his cash account when his payments were not received within the seven-day period after the transactions, not only would Shearson have recouped the amounts owed, but Strand would have received a sizeable surplus from the sale of the shares. Shearson's failure in this respect, according to Strand, bars Shearson's recovery of the deficiency and entitles Strand to an award for the surplus that should have been realized. Shearson replies to Strand's allegations by asserting that it is the victim of a market manipulation scheme perpetrated by Strand. Shearson also responds that it did not violate the applicable regulations governing Shearson's liquidation of the M & L Investments account and, even assuming such a violation occurred, that Strand legally cannot benefit from such a violation and the deficiency action is not barred.

## II. DISCUSSION

### A. Breach of Contract

■ At trial, the parties focused on the contract claims. Shearson and Strand entered into an agreement when Strand opened the M & L Investments trading account in March of 1985. Plaintiff's Exhibit 11, Doc. 1. The parties do not dispute that the account was a "cash account" employing Shearson for the purpose of trading in securities as directed by Strand as Strand's agent. Neither do the parties dispute that the parties' performance is to be measured by the trade practices and customs of the brokerage industry. *See Anderocci v. Wolf Sales & Serv. Corp.*, 79 A.D.2d 559, 433 N.Y.S.2d 799 (1980)[5] (lower court committed error by ignoring industry-accepted custom in interpreting employment contract); *Preminger v. Columbia Pictures Corp*, 49 Misc.2d 363, 267 N.Y.S.2d 594, 599 (Sup.Ct.) (weight is given to trade custom in contract construction), *aff'd*, 25 A.D.2d 830, 269 N.Y.S.2d 913 (1966). The parties dispute, however, exactly what the applicable trade practices and customs are and their effect.

Under the agreement, Shearson was to purchase securities as ordered by Strand, and Strand was to pay for the securities plus a commission within seven days of the trade date. The evidence demonstrates that Shearson purchased 34,500 shares of Atlantic Mining at Strand's direction in late June. Strand did not pay for these purchases within seven days or at any later date. Shearson asserts that Strand thereby breached the parties' contract and is liable for damages.

Strand asserts two affirmative defenses to Shearson's breach of contract claim that warrant discussion by the court. First, Strand argues that his breach by failing to make payment is excused because Shearson breached the contract and thereby caused Strand's breach. *See* Defendant's Post Trial Brief Doc. 79 at 9–10. Specifically, Strand alleges that Shearson breached the contract by failing to deliver physical possession of stock certificates to Strand in June of 1986. Through the end of May and all of June, Strand continually requested delivery of stock certificates from Shearson. Strand sought certificates for the 69,200 shares of Atlantic Mining that he had purchased through Shearson and for which he had fully paid by the end of May. In mid-June, Strand received certificates for 40,000 shares. However, Shearson did not deliver certificates for the remaining 29,200 shares. Strand contends that he needed physical possession of certificates for these shares to arrange payment for the 34,500 shares he purchased in late June. Strand argues that Shearson's failure to deliver the certificates for the 29,200 shares relieved him of his obligation to pay for the shares he ordered purchased in late June.

As the evidence substantiates Shearson's allegations that Strand simply failed to pay for the shares he purchased and thereby breached the contract, the key initial issue for the court to determine is whether Shearson also breached the contract by failing to deliver stock certificates. If the court finds that Shearson did breach the contract by failing to deliver, the court must then determine whether that breach obviated Strand's duty to pay for the shares he purchased. The parties agree that Shearson had a duty under the contract to deliver physical stock certificates to Strand within a reasonable time after Strand requested the certificates. *See* Plaintiff's Reply Doc. 4 at ¶ 19. *See generally R. Baruch & Co. v. Springer*, 184 A.2d 206, 208 (D.C.Mun.App.1962) (broker has duty to deliver stock certificates within reasonable time of customer request). Predictably, the parties disagree over what constitutes a reasonable time within which certificates should have been delivered.

Due to the manner in which the parties presented their evidence and arguments, the court starts its analysis by determining when Strand became entitled to delivery of the stock certificates. In other words,

---

**5.** The parties' written contract states that their agreement shall be governed by New York law.

Plaintiff's Exhibit 11.

when did the reasonable time period for delivery begin to run? At trial, Shearson presented evidence of a trade practice that resolves this issue. The brokerage industry has a "pay-out" limitation that applies to a brokerage house's payments to account holders. Under the limitation, a brokerage house does not pay out proceeds of transactions to account holders if the account holder has an outstanding debit balance with the brokerage. The limitation curtails delivery of both cash proceeds and negotiable stock certificates.

Strand testified as his own expert witness at trial. When questioned about the "pay-out" limitation, Strand acknowledged the limitation. Strand did not dispute the applicability or the validity of the limitation. Based on the evidence presented in this case, the court accepts the "pay-out" limitation as restricting Shearson's duty to deliver certificates to Strand. *See generally Anderocci*, 433 N.Y.S.2d at 799 (applicability of industry practices); *Preminger*, 267 N.Y.S.2d at 599.

The "pay-out" limitation operates to deny Strand entitlement to disbursement of proceeds in his account, in this case certificates, until May 28, 1986. Shearson's records of Strand's account indicate that an outstanding balance existed until May 29, 1986. But the Shearson records also appear to indicate that Shearson actually received Strand's check payment on May 28th. Since Shearson failed to explain this apparent ambiguity, the court finds that Shearson had been paid in full on May 28th. As Strand was not entitled to a "pay-out" until May 28th, the reasonable time for delivery of certificates did not begin to elapse until May 28th.

The next step would be to ask when the reasonable time for delivery of certificates elapsed. Due to the manner in which the parties presented the case, however, the court need not actually resolve that difficult issue. Instead, the next issue for determination is when the "pay-out" limitation again operated to deprive Strand of his entitlement to delivery of certificates. Strand and Shearson's witnesses essentially agreed that the brokerage need not deliver certificates to a customer that owes the brokerage money for a purchase of stock made at the direction of the customer. As noted in the preceding paragraph, Strand settled his Shearson account on May 28th. The reasonable time for delivery of certificates, therefore, began to run on May 28th. In late June, Strand ordered the purchase of additional shares of stock. Strand never paid Shearson for those shares. The question then arises when the "pay-out" limitation operated to relieve Shearson of its duty to "pay-out" proceeds to Strand, in the form of certificates, in view of the late June stock purchases. The parties disagreed at trial over this date. Once this date is determined, the court can then measure the resulting "window" of time within which Shearson had a duty to deliver certificates to Strand. It can then be determined whether that window of time was greater than or less than a reasonable time for delivery of certificates.

As noted *supra*, Strand's account was a cash account which allowed him seven days to pay for stock trades. Strand argues that the "pay-out" limitation does not apply until the end of the seven day grace period when payment would be past due. Shearson, Strand asserts, would therefore not be relieved of its duty to deliver certificates until seven days after the June 24th purchase of Atlantic Mining stock. Shearson argues that, according to industry practice, the customer owes the debt as soon as the trade is made, and the debt is not overdue until the end of the seven day period. Under this view, the industry practice would close Strand's window of entitlement and permit Shearson to refuse to deliver certificates on the date of the new trade, in this case June 24th.

The court finds Shearson's interpretation of the trade practice more persuasive. The "pay-out" limitation is simple; if a customer owes the brokerage money, the brokerage doesn't pay out assets to the customer. In the fast moving securities industry where money is made and lost in a matter of minutes, the "pay-out" limitation serves to protect the broker. When the customer establishes an account with the broker, the broker takes a security interest in the cus-

tomer's assets held by the broker to secure payment for trades. *See, e.g.,* Plaintiff's Exhibit 11 Doc. 3 at ¶ 4 (Strand and Shearson's written contract granting Shearson a security interest in Strand's assets held by Shearson). The "pay-out" limitation serves to enforce this security interest by allowing the brokerage to refuse to relinquish its collateral before the time for payment has passed. To interpret the limitation as suggested by Strand would be to deprive it of meaningful value. The court finds, therefore, that the "pay-out" limitation suspended Shearson's duty to deliver certificates to Strand on June 24, 1986, when it purchased additional shares of Atlantic Mining at Strand's direction. The window of time in which Strand had the right to demand delivery of physical certificates was, therefore, between May 28, 1986 when he paid the debt in his account to June 24, 1986, when he incurred a new debt to Shearson. Since Shearson failed to deliver certificates for 29,200 shares to which Strand was entitled during that time, the court must next determine whether a reasonable time for delivery of the certificates had elapsed when Strand's window of entitlement to delivery closed on June 24th.

The parties identify three possible time limits as the industry standard to measure the duration of a reasonable time in which delivery of stock certificates is due. Shearson first presented evidence of the transfer process and the various parties whose participation is required to obtain physical stock certificates. An experienced operations manager testified that the time required for the transfer process and obtaining certificates is normally between four and six weeks. *See* Trial Transcript, Testimony of Karen Heaps at 10. Shearson also presented testimony through a stock market legal expert on the regulations promulgated pursuant to section 15(c) of the Securities Exchange Act of 1934 relevant to

physical delivery of stock certificates. *See* Plaintiff's Post Trial Brief Doc. 75 at 31. The Shearson expert identified regulations that he interpreted as setting an indefinite stock certificate delivery guideline of 40 days or more. *See id.* (discussing S.E.C.Gen.Reg. 17 C.F.R. § 240.15c3–3(c)(3) (1990)). Strand testified about his interpretation of a set of intricate National Association of Securities Dealers regulations that he asserts establish a 35 day limit for delivery of certificates. *See* Defendants' Post Trial Brief Doc. 79 at 12.

In light of the court's evaluation of the evidence presented regarding the industry practice of limiting pay-outs, the court need not determine which of the three alternatives is the proper measure. The window of time in which Strand was entitled to demand delivery of physical certificates lasted from May 28th to June 24th, only 26 days. The court concludes that, under any of the three proposed measures, a reasonable time had not expired when Shearson's duty to deliver certificates was suspended by Strand's order of additional stock purchases.[6] Shearson's duty under the contract was to deliver certificates within a reasonable time. As a reasonable time during which Strand was entitled to delivery of stock certificates did not elapse, Shearson did not breach the contract. For the foregoing reasons, the court rejects Strand's affirmative defense and counterclaim based on Shearson's failure to deliver the requested stock certificates.

## B. Regulation T

Having determined that Shearson did not breach the contract between it and Strand by delaying the delivery of stock certificates, the court must now address Strand's alternative affirmative defense based on Regulation T.[7]

---

6. The court expressly notes that it does not determine what constitutes a reasonable time for the delivery of stock certificates. The court has not been presented with nor discovered any authority dispositive of that issue. *Cf.* Congressman Fortney H. Stark, Jr., SEC No–Action Letter, (Dec. 20, 1982) ("There are no statutory provisions or Commission rules explicitly estab-

lishing a maximum length of time between a broker's purchase of securities for a *customer* and delivery of the securities [certificates] to the customer").

7. Strand did not advance his Regulation T affirmative defense/counterclaim in his answer, counterclaim, subsequent documents or pretrial

Section 7 of the Securities Exchange Act of 1934 sets forth margin requirements which govern the extension of credit by stock brokerages to their clients. 15 U.S.C. § 78g. Subsection (a) of section 7 authorizes the Board of Governors of the Federal Reserve System to "prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security." *Id.* § 78g(a). Section 7(c) provides:

It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

(1) on any security ..., in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section
...

*Id.* § 78g(c).

Pursuant to the authority granted by section 7(a) of the Exchange Act, the Board of Governors of the Federal Reserve System promulgated regulations governing margin requirements. The regulation which is here relevant, Regulation T, is found at 12 C.F.R. § 220.8 and provides in pertinent part:

(a) *Permissible transactions.* In a cash account, a creditor may:

(1) Buy for or sell to any customer any security if: (i) There are sufficient funds in the accounts; or (ii) the creditor accepts in good faith the customer's agreement that the customer will promptly make full cash payment for the security before selling it and does not contemplate selling it prior to making such payment.

* * * * * *

(b) *Time periods for payment: cancellation or liquidation—*(1) *Full cash payment.* A creditor shall obtain full cash payment for customer purchases within 7 business days of the date:

(i) any nonexempted security was purchased;

* * * * * *

(4) *Cancellation: liquidation: minimum amount.* A creditor shall promptly cancel or otherwise liquidate a transaction or any part of a transaction for which the customer has not made full cash payment within the required time....

12 C.F.R. § 220.8 (1986).[8] As is mentioned, *supra,* the M & L Investments account in which Strand was trading was a cash account and therefore any extension of credit in that account would have been governed by Regulation T.

Strand argues that Shearson violated Regulation T when it failed to liquidate his account "promptly" after the seven-day settlement period prescribed by the regulation elapsed and in so doing illegally extended credit. Strand alleges that, had Shearson liquidated the account as required by Regulation T, Shearson would have recovered the amount owed it by Strand and Strand would have received a large surplus resulting from the sale of the other shares which were then held in the account as security. Strand apparently would have the court hold that Shearson's violation of the regulation either bars Shearson's recovery of the deficiency or, alternatively, reflects on the damages calculation by suggesting that the manner in which Shearson liquidated the account was somehow unreasonable.

Shearson counters that it did not violate Regulation T in its handling of the M & L Investments account and, even assuming a violation occurred, Shearson argues that Strand has no standing to assert such a violation as an affirmative defense. Finally, Shearson alleges that, assuming a violation and Strand's ability to posit that viola-

---

order. The issue was, however, argued at trial and both Shearson and Strand briefed the issue in some detail in their respective post-trial memoranda.

8. In 1990 this section was amended by the Federal Reserve Board. Although the provisions relevant to this case were largely left unamended, the court applies the version of the regulation which was then in effect.

tion in defense of the Shearson claim, he is nevertheless estopped from taking advantage of the defense because his own actions induced the violation. In this respect, Shearson relies on evidence that Strand intervened when Shearson began liquidating the M & L Investments account, demanded that Shearson cease its liquidation and represented that the promised payment was forthcoming.

The court's analysis of this issue thus consists of the following questions: (1) whether Shearson violated Regulation T; (2) whether such violation properly may be asserted as an affirmative defense to Shearson's action or, alternatively, may be the basis of a counterclaim; and (3) whether Strand's complicity in the violation would preclude his reliance on such a defense or counterclaim.

### 1. Shearson violated Regulation T

■ At trial Shearson's expert testified, and Shearson subsequently argued in its post-trial brief, that Regulation T required Shearson to "promptly and reasonably" liquidate an account after the seven-day period prescribed by the regulation expires and the client has not tendered payment. Plaintiff's Post-trial Memorandum, Doc. 75 at 37. Shearson argues that it complied with this prompt and reasonable standard by commencing liquidation of the M & L Investments account on July 11, although that liquidation terminated after just three days and after just 4,500 shares were sold. Shearson made no further effort to liquidate the account for over two months, when on September 19, the remaining 54,-215 shares were sold at fifty cents per share.[9]

Strand urges upon the court a stricter view of Regulation T which requires liquidation of any delinquent account "promptly". Under Strand's view, any broker who fails to liquidate a cash account immediately if the seven-day settlement period expires without payment violates the regulation and "acts at its own peril." *Blanken v. Harris, Upham & Co.*, 359 A.2d 281, 283 n. 5 (D.C.1976).

In deciding which of these two interpretations of the regulation is correct, this court is, in effect, asked to define the parameters of the term "promptly" as it appears in the regulation. Were the question placed before the court whether Shearson acted promptly within the meaning of the regulation by commencing the liquidation on July 11 and selling shares a little at a time until the account was depleted, the court would face a difficult task.[10] Under such a scenario, Shearson might well have taken until September 19 to entirely liquidate the account. The court then would be without guidance as to whether such conduct would be "prompt." Such is not the case, however. The court need not define the precise meaning of "promptly" to conclude that Shearson did not so act in waiting more than two months after the settlement date and over a month and a half beyond the commencement of litigation to liquidate the account. The court therefore finds that Shearson violated Regulation T by extending credit to its cash account client during that period.

### 2. Violation of Regulation T is a defense under New York law

Shearson argues that there is no private cause of action for a violation of Regulation T and, consequently, Strand cannot successfully assert an affirmative defense

---

**9.** The court here notes that on August 7, 1986, Shearson filed suit in this action. It continued to hold the shares in the M & L account for approximately six weeks beyond that time while making no effort to liquidate the shares.

**10.** At trial, both sides agreed that the market for Atlantic Mining shares simply could not have absorbed all of the shares that Shearson would have been obligated to liquidate had they been sold on one day in lump sums. In this respect, there was evidence presented that, at the same time Shearson was charged with liquidating the M & L account, it was also in the process of liquidating nearly 100,000 shares of Atlantic Mining from the delinquent account of George Perry. Despite the compelling simplicity of the argument that Shearson should have dumped the entire M & L account on the day after the settlement period ended in order to comply with Regulation T, it is simply not realistic to impose such a burden.

based on a Regulation T violation to Shearson's breach of contract action.

As asserted by Shearson, federal courts have long held that an injured client has no private cause of action against a broker who violates Regulation T. In *Utah State University v. Bear, Stearns & Co.*, 549 F.2d 164 (10th Cir.), *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977), the Tenth Circuit Court of Appeals held that there is no private cause of action for a violation of Regulation T. *Id.* at 169–70. In arriving at that conclusion, the court explained:

> In 1970 Congress amended the 1934 Act by adding § 7(f), 15 U.S.C. § 78g(f), which declares that it is illegal for any person to obtain, receive, or enjoy the extension of credit in connection with the purchase of securities contrary to the Federal Reserve System regulations. The Board of Governors of the Federal Reserve to implement the amendment promulgated Regulation X, 12 C.F.R. Part 224, which prohibits any person from obtaining credit when to do so would cause the creditor to violate Regulation T.
>
> The primary purpose of the 1970 amendment was to promote the stability of the securities markets. See 2 U.S.Code Cong. & Admin.News 1970, pp. 4409–4410. *The responsibility for compliance with the margin requirements is now on the customer as well as the broker.*

*Id.* at 170 (emphasis added). The court further elaborated on the policy reason underlying its holding: "Congress imposed the margin requirements to protect the general economy, not to give the customer a free ride at the expense of the broker." *Id.* Thus a client has no private cause of

action for a broker's violation of Regulation T.

But this does not end the analysis. It must next be determined whether the lack of a private cause of action for a violation of Regulation T necessarily implies that a client in the position of Strand may not invoke the broker's regulatory violation as an affirmative defense in a contract action. Few reported decisions have addressed this narrow issue, but among those which have are found several cases which rule that a broker's violation of Regulation T cannot be an affirmative defense to a breach of contract action.

In *Bache Halsey Stuart, Inc. v. Killop*, 509 F.Supp. 256 (E.D.Mich.1980), a federal district court referred to the policy considerations identified by the *Bear, Stearns* court, *supra*, and concluded that there is no affirmative defense based on the broker's violation of Regulation T that a client may assert against a stock brokerage's action to recover account balances from a client. *Id.* at 259. The court explained:

> In the case before this court, allowing the affirmative defense urged by [the client] would have the effect of encouraging stock transactions through the use of prohibited credit. Recognizing this defense would offer tantalizing temptation to an individual who wishes to speculate in the stock market without risking his own money.... Recognition of the view that Congress imposed the margin requirements to protect the general economy from the infusion of prohibited credit mandates the rejection of [such an] affirmative [defense] ...

*Id.*[11]

In another case, *Styner v. England*, 40 Wash.App. 386, 699 P.2d 234 (1985), the Washington Court of Appeals held that a

---

11. On rehearing, the court modified its position somewhat and held that section 29(b) of the Securities and Exchange Act, 15 U.S.C. § 78cc(b),

> provides the only legally cognizable defense to an action for money due under an account agreement ... and there is no "common law" defense available to a client such as defendant based on alleged violations on the part of a broker apart from the protection afforded by § 29(b).

*Id.* at 262. The court went on to conclude that the only relevance of a Regulation T violation by a broker was a factor in determining whether rescission of the underlying contract was justified under section 29(b). *Id.* at 263. Because neither party in the present case has argued that the contract between them should be rescinded, this holding is inapplicable.

broker's violation of Regulation T is not an affirmative defense to the brokerage's subsequent state law claim for unpaid account balances and breach of contract. *Id.*, 699 P.2d at 239. The court initially stated the relationship between federal securities law and state common law causes of action: "Claims based on federal law must be brought in federal court under 15 U.S.C.A. § 78aa, but that law may be asserted as a defense to a claim brought in state court." *Id.* at 237 (citations and footnote omitted).[12] The court then catalogued two reasons why a broker's violation of regulation T is not an affirmative defense to a breach of contract action. First, the court focused on the macro-economic objectives of the margin requirements as manifested by the text and structure of section 7 and Regulation T. According to the court, the objective of the margin requirements is to benefit the market in general and not to specifically benefit individual investors. The court noted a total absence of any legislative history or other manifestation of congressional intent to create a private remedy by enacting the margin requirements. *Id.* at 238. Second, the court emphasized the role of section 7(f) and Regulation X in equalizing the burden of complying with the margin requirements between brokers and clients and concluded that it would be inconsistent with that role to imply a private cause of action in favor of the client. *Id.* at 239.

Similarly in *Gregory–Massari, Inc. v. Purkitt*, 1 Cal.App.3d 968, 82 Cal.Rptr. 210 (1969), the California Court of Appeal held that a broker's violation of Regulation T with respect to its failure to liquidate the client's account at the expiration of seven days after the cash account transaction involved did not bar the broker's action to collect the losses it sustained. The court agreed with the trial court in its finding that the broker's conduct violated Regulation T but explained that "it does not follow that the violation of that regulation rendered the transaction void so as to deprive plaintiff of the right to sue on its contract for the damage it has suffered." *Id.* 82 Cal.Rptr. at 212. The court explained the rationale for its decision as follows:

> the entire contract was that plaintiff would sell the stock to defendants and defendants would pay for it. Performance of the agreement required no other action by either party. Liquidation of the debt in the event of defendants' default was no part of the agreement. Plaintiff did not agree to sell the stock after 7 days, or at all. Its duty in that respect was imposed by the regulation. *Failure to liquidate the account promptly was in violation of Regulation T but it was not a violation of the contract,* which did not directly or impliedly involve any illegal action in its performance.

*Id.* at 213 (emphasis added).

Despite these opinions and the positions taken therein, this court is nevertheless obliged to resolve this case according to New York state law.[13] In *Thomson McKinnon Securities, Inc. v. Hornung*, 69 A.D.2d 118, 419 N.Y.S.2d 526 (1979), a New York appellate court addressed the impact of a stock brokerage's violation of Regulation T and other securities regulations[14] on the brokerage's breach of contract action to recover amounts resulting from the brokerage's "cover" of a client's "short sale" of securities. The facts of that case were that a client who was sophisticated in the

---

**12.** This aspect of the opinion is significant because, as is noted *infra*, the present case involves the role of federal securities law as an affirmative defense to a state law cause of action.

**13.** *See supra* footnote 4.

**14.** In addition to Regulation T, the court also analyzed the plaintiff broker's violation of Rule 15c 3–3m of the Securities and Exchange Commission, 17 C.F.R. 240.15c 3–3m (1979), which at that time provided:

> If a broker or dealer executes a sell order of a customer (other than an order to execute a sale of securities which the seller does not own), and if for any reason whatever the broker or dealer has not obtained possession of the securities from the customer within 10 business days after the settlement date, the broker or dealer shall immediately close the transaction with the customer by purchasing the securities of like kind and quantity ...
> *Id.*

trading of securities instructed the broker to sell securities that the client did not possess at the time of the sale. Regulation T provided that a stock broker may not sell a security for a client unless the security sold is then held in the client's account or, alternatively, the broker must be informed that the client or his principal owns the security and the creditor, in good faith, accepts an agreement that the security will promptly be deposited into the selling client's account. 12 C.F.R. § 220.4(c) (1979). Because the broker had taken no measure to ascertain whether the *Hornung* defendant possessed the securities sold, and the securities were not then in the client's account, the broker violated Regulation T. *Hornung*, 419 N.Y.S.2d at 527 n. 1. Despite this "clear violation of the law," *id.* at 528, the court acknowledged that recognizing a client's private right of action for such a violation placed the client in the unfairly advantageous and enviable position of " 'heads-I-win-tails-you-lose.' " *Id.* at 529 (quoting *Pearlstein v. Scudder & German,* 429 F.2d 1136, 1148 (2nd Cir. 1970) (Friendly, J., dissenting), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971)). Under this view, were clients given a private right of action, a client who is able to induce the broker to violate the margin requirements would be entitled to sue for any profit resulting from the extension of credit, but would not be responsible for losses incurred by the brokerage because of the violation of the regulation. The court noted that the congressional enactment of section 7(f) of the Securities Exchange Act of 1934 and promulgation of its accompanying rule, Regulation X,[15] imposed "upon customers the same limitations upon receiving credit as are imposed upon brokers and dealers in extending credit." *Hornung,* 419 N.Y.S.2d at 528 (citation omitted). Because the duties with respect to compliance with the margin requirements were thus shared equally between client and broker, the court determined that "[a] customer who violated the credit restrictions of Regulation X could no longer seek redress from the broker." *Id.* (citation omitted). The

court proceeded to hold, however, that the abolition of a client's cause of action to recover for a broker's violation of Regulation T did not necessarily mean that the broker in violation of Regulation T could disregard its own illegal conduct in recovering from its client. In the words of the court:

> However, to say that § 7(f) bars actions by the customer is not to say that it confers a right of action upon the broker or dealer. Palpably, it was not the purpose of the Congress to reverse the relative juridical positions of the parties by reviving the broker's cause of action, while denying such relief to the customer. Its ostensible intent was to equalize their status before the law.
>
> Here, plaintiff and defendant have each violated the law. Each is experienced in the ways of speculation. The parties are, therefore, *in pari delicto* ("Civil Liability for Margin Violations: The Effect of Sections 7(f) and Regulation X", 43 Fordham L.Rev. 93, pp. 99 *et seq.*), and *neither is entitled to invoke the aid of the Court.*
>
> The Congress, and the institutions created by it for that purpose, have mandated the standards of behavior applicable to the situation here presented. Those standards will not consciously be lowered by any judgment of this Court.

*Id.* at 528 (emphasis added). On this reasoning, the court affirmed the trial court's dismissal of the brokerage's complaint.

The *Hornung* rule that mutual violations of federal securities regulations governing margin requirements will preclude both broker and client from recovery on the underlying transaction in a state law cause of action for breach of contract has subsequently been cited with approval by other New York decisions. *See e.g., Berliner Handels–Und Frankfurter Bank v. Coppola,* 568 N.Y.S.2d 751 (App.Div.1991) (under *Hornung,* mutual violations of margin requirements by bank and borrower in connection with loan for purchase of securities could prevent recovery by either party and remaining factual questions relating to that

**15.** *See* discussion of section 7(f) and Regulation X *infra.*

issue precluded summary judgment for plaintiff bank); *Jeremias v. Shearson Hayden Stone, Inc.*, 72 A.D.2d 506, 420 N.Y.S.2d 881, 882–83 (1979) (plaintiff client's violation of Regulation T and his concomitant "status as wrongdoer" precluded court from allowing plaintiff's recovery for profit resulting from improper extension of credit by brokerage); *but cf., Shearson Hayden Stone, Inc. v. Feldman*, 109 Misc.2d 403, 439 N.Y.S.2d 975, 977 (Civ.Ct.1980) (trial court held that broker's violation of Regulation T did not bar cause of action on the contract but measure of broker's damages limited to "date on which the transaction in issue was required to be closed by the margin regulations when the customer fails to make payment"); *Billings Assoc., Inc. v. Bashaw*, 27 A.D.2d 124, 276 N.Y.S.2d 446, 446 (1967) (broker not barred from recovery because of violation of Regulation T; measure of damages is the difference between the purchase price of the stock and the highest market price thereof between the seventh day after the transaction and the date of sale by the broker). Pursuant to the provision in the contract entered into by Strand and Shearson which identifies New York law as the governing law in this dispute, this court concludes that the *Hornung* rule is here applicable.[16] The effect of that rule is to recognize that a brokerage's violation of Regulation T affords a client defendant a viable affirmative defense against the brokerage's breach of contract claim. Here, Shearson clearly violated Regulation T and its complaint is therefore dismissed.

**3. The effect of Strand's complicity in the Regulation T violation**

■ The dismissal of Shearson's complaint does not end this matter. Strand argued at trial that, but for Shearson's violation of Regulation T and its failure to timely liquidate his account, he would have received a surplus from the sale of stock ranging from \$782,372.52 to \$925,052.52.[17] The next issue for determination is therefore whether Strand's complicity in the Regulation T violation precludes his recovery of any such surplus. Under the *Hornung* rule set forth above, to the extent that Strand violated Regulation X, he is barred from recovering damages resulting from the brokerage's violation of Regulation T.

Regulation X was promulgated by the Board of Governors of the Federal Reserve System under section 7 of the Securities and Exchange Act of 1934. 12 C.F.R. 224.-1(a) (1991). Section 7(f) of the 1934 Act provides:

> It is unlawful for any United States person ... to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender ... for the purpose of (A) purchasing or carrying United States securities, ... if, under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited ...

15 U.S.C. § 78g(f)(1). Regulation X, in turn, provides that "any borrower who willfully causes credit to be extended in contra-

---

**16.** Curiously, neither *Feldman* nor *Billings* have been cited by subsequent New York courts. Those cases clearly are contrary to this court's holding as to the currently applicable New York law on this point. In view of the fact, however, that *Hornung* has been cited favorably by at least one recent appellate decision and the cases rejecting the rule that a broker's violation of Regulation T provides the client with a viable affirmative defense have not been cited, the *Hornung* rule appears to be the most favored position of the New York courts.

**17.** Strand proposes three alternative amounts of the surplus he should have received had Shearson timely liquidated. First, he relies on evidence that between June 27 and July 3, 1986, another brokerage in the local market sold 161,-000 shares at \$12.14 per share. Liquidation of the M & L Investments account at this price would have yielded a surplus, after payment of the debt owing to Shearson, of \$925,052.52. Second, Strand argues that if the M & L Investments account had been liquidated on July 1 (the first settlement date after the late-June transactions), the price per share would have been \$11.38 and Strand's surplus would have been \$850,000.00. Finally, Strand argues that the average price per share for the three-day period in which the stock should have been liquidated in accordance with Regulation T, July 1–3, was \$10.69. Assuming that Shearson could have liquidated the entire account at this price, Strand alleges that his surplus would have been \$782,372.52.

vention of Regulations G, T, or U, ... must conform the credit to the margin regulation that applies to the lender." 12 C.F.R. § 224.3(b) (1991).[18] In other words, if a client willfully causes a brokerage to extend credit, the client is equally responsible for compliance with the regulations governing the brokerage. In the present case, there was ample evidence presented at trial that Strand took an active role in procuring the illegal extension of credit in the M & L Investments account. He had repeated discussions with Shearson representatives in which he indicated that payment was forthcoming for the shares he purchased. Shearson witnesses also testified that the reason Strand turned over the 40,000 shares for which he had paid and received certificates was as an indication of his "good faith" in paying for the subsequently purchased shares. Finally, Strand called Shearson when the latter initially began liquidating the M & L Investments account and urged them to postpone the liquidation pending his immediate payment for the shares. Strand therefore violated Regulation X by enjoying the beneficial use of an extension of credit which he willfully caused. Consequently, under *Hornung*, he may not seek the aid of this court in recovering damages resulting from that illegal extension of credit. His counterclaim is therefore dismissed.

## C. Restitution

In his counterclaim, Strand included a claim for restitution of the 40,000 shares which were given to Shearson in late June, but which were never received back into his account and were never liquidated by Shearson. The evidence presented at trial supports Strand's contention that the shares were paid for in full and that Shearson has retained possession of the certificates representing these 40,000 shares throughout the pendency of this action. The shares were offered to Shearson as a sign of good faith but were never negotiated to Shearson nor placed in the M & L Investments account. The court therefore orders restitution of the certificates to Strand.

## D. Miscellaneous

Shearson also brought a claim for fraud against Strand. To prevail on a claim of fraud a party must demonstrate the essential elements of fraud. Those elements are representation of material existing or preexisting fact, falsity, intent to deceive, deception, and injury. *Atlantic Welding Services, Inc., v. Westchester Steel Fabricators Corp.*, 570 N.Y.S.2d 410, 412 (App.Div.1991). Shearson argues that Strand agreed to pay for the stock purchased in late June but had no intention of so doing. The court is not persuaded that Strand intended not to pay for the stock when he ordered it. The element of intent to deceive is, therefore, lacking. Shearson did not sustain the clear and convincing standard of proof necessary to prevail on the fraud claim. Shearson's fraud-based claim for punitive damages is equally without merit.

Shearson also devoted some evidence and argument to proving that Strand was engaged in a market manipulation. Shearson did not propose that this alleged market manipulation constituted fraud or even a cause of action. Shearson asserted the market manipulation theory as a defense to Strand's counterclaim for breach of contract. Shearson presented this theory as a shield to defend against a sword the court determines does not exist. The court need not rule, therefore, on the merits of the Shearson market manipulation argument.

## III. CONCLUSION

The evidence at trial demonstrated that Shearson purchased stock at the direction of Strand and pursuant to the terms of a written contract the parties entered. As a result of this purchase, Strand incurred a debt to Shearson for the purchased stock and commissions of approximately $318,-886.41 that Strand failed to pay. The evidence further demonstrated that Shearson was not in breach of contract for failure to deliver physical stock certificates to Strand

---

**18.** Regulation X has not been altered or amend-ed since the times relevant to this case.

within a reasonable time after Strand made demand. A reasonable time for delivery of physical certificates did not elapse after Strand was entitled to delivery before Strand incurred a new debt to Shearson thus suspending his entitlement to certificates and Shearson's duty to deliver. The evidence failed to show that Strand incurred this debt with the intention not to pay it.

Furthermore the evidence showed that Shearson violated the applicable securities regulations setting forth margin requirements. Had Shearson complied with those regulations, much of the damages incurred by both sides in this dispute may have been avoided. Moreover, under New York law, which the parties to the contract agreed to be bound by, Shearson's failure to comply with Regulation T is an affirmative defense to its action for breach of the contract and its claim is dismissed. Because the same principle bars Strand from recovery for damages resulting from an illegal credit extension which he induced, his counterclaim is also dismissed.

The court, therefore, orders that judgment be entered in favor of Defendants, M & L Investments, Michael Strand and Lois Strand on all of Plaintiff Shearson Lehman Brothers, Inc.'s claims. The court further orders that judgment be entered in favor of Counterclaim Defendant Shearson Lehman Brothers, Inc. on all of Counterclaimants claims except restitution. In that regard, Shearson is ordered to restore Strand's 40,-000 shares of Atlantic Mining stock to him.

IT IS SO ORDERED AND ADJUDGED.